JOHN KENNEDY, Plaintiff in Error, v. THE PEOPLE OF
THE STATE OF NEW YORK, Defendants in Error.

*Indictment—Murder—Degrees—Name of Criminal.*

An indictment for murder in the common law form, charging the killing
with malice aforethought, is good, notwithstanding our statute has divided
the crime of murder into different degrees; and a conviction as charged is a
conviction of murder in the first degree.

The statute is not a rule of pleading, but a guide to the conduct of the trial,
prescribing the proofs requisite to a conviction.·

Charging the killing of T. H., alias T. J., is not defective for uncertainty, nor
duplicity.   That expression does not import a killing of "either T. H. or T.
J.," but a killing of T. H., otherwise called or known as T. J.   The omission
of the other Latin word "dictus" is not material.

On a trial for murder it is competent to prove that the deceased had money
in his possession shortly before his death.   How far back the inquiry should
extend will depend upon the circumstances, which may render it more or less
probable that the deceased retained it in his possession.

But declarations of the deceased, some weeks before his death, that he had
no money, are not admissible as proof of that fact.

The form, nature, extent, depth, length, width, and direction of the fatal
wounds, with their precise location on the head, the amount of force requisite
to produce them, and the probable shape of the instrument, being proved, it is
not competent to receive the opinion of the surgeon as to the probable posi-
tion of the deceased when the blows were received.   Surgeons are not pre-
sumed to be experts in the matter of giving or receiving such blows, and the
jury are equally capable of drawing the proper inferences from the facts
proved, if material.

But where it was conceded throughout the trial that a wilful and deliberate
murder had been committed, the admission of such an opinion furnishes no
ground for the reversal of the judgment, it having no possible bearing on the
question whether the prisoner was the perpetrator—the only question in fact
contested.

At a Court of Oyer and Terminer for the county of St. Law-
rence, the Plaintiff in Error was indicted, tried, found guilty, and
sentenced to be hung for murder.   The indictment charged that
on the 10th of February, 1867, John Kennedy (the Plaintiff in
Error), at the town of Dekalb in the said county, &c., "in and upon
one Thomas Hand, alias Thomas Jackson, in the peace of the

people," &c., " wilfully and feloniously, deliberately and premeditately did make an assault," and " with a certain axe which he, the said John Kennedy, in his hands then and there had and held, him, the said Thomas Hand, alias Thomas Jackson, in and upon the head of him, the said Thomas Hand, alias Thomas Jackson, then and there wilfully, deliberately, premeditately, feloniously, and of his malice aforethought, did beat, strike, stab, cut, and wound, giving unto the said Thomas Hand, alias Thomas Jackson, then and there, with the axe aforesaid, in and upon the head . . one mortal wound of the breadth, &c., . . of which said mortal wound he, the said Thomas Hand, alias Thomas Jackson, on," &c., at, &c., " did die; and so the jurors aforesaid do say that he, the said John Kennedy, him, the said Thomas Hand, alias Thomas Jackson, in manner and form and by means aforesaid," at, &c., " on the day and year aforesaid, wilfully, deliberately, premeditately, feloniously, and of his malice aforethought, did kill and murder, against the form of the statute," &c., " and against the peace,"&c.

When the case was brought on for trial the counsel for the prisoner moved to quash the indictment, on various grounds, which were overruled, and exception was taken. Two only of the objections then taken are insisted upon in this Court—First, that the indictment is bad for duplicity, " for the reason that it charges the prisoner with the murder of Thomas Hand, alias Thomas Jackson; " and second, that if it was intended to charge that Thomas Hand was also known by the name of Thomas Jackson, then the words in the indictment should have been " Thomas Hand, *alias dictus* Thomas Jackson."

On the trial the first witness examined was Dr. John R. Furness, a physician and surgeon, and Coroner of the county. He was called to examine the body of the deceased : found the body in the cellar of the house in which the deceased lived alone. He described the wounds upon the head, the room in which was the stove, the furniture, and the bed of the deceased, the bloody axe found near the stove, the blood on the floor, and the trap-door at the foot of the bed under which lay the body. He gave, with great particularity,

the form, extent, and depth of two wounds—one on the left-hand side of the back part of the head, and the other on the top of the head; gave his opinion as to the shape of the instrument by which the wounds were made, and the direction of the blows, and their effect, thus: "The shape of the instrument that created the wounds I cannot say further than it was a blunt instrument; each of those wounds cut arteries. The wound on the back part of the head must have cut a superficial artery—a branch of the occipital artery; and the wound on the top of the head must have injured arteries—not cut them, but torn them. Blood would flow instantly on receipt of the blow inflicting those injuries. The instrument that inflicted the blow back of the ear must have been longer than it was wide, and blunt. It injured the back part of the head, on the left side back of the ear, and the bone back of the ear. The skin was raised slightly, as if peeled a little from the bone, leaving a gash or open wound of about half an inch wide, and the depth was as far as to the bone. Striking the scalp from above and backward would make such a gash—in a vertical or slanting direction: a blow with a blunt instrument."

The counsel for the people thereupon inquired: "In what position do you judge the body to have been when it received the blow upon the side of the head?"

The question was objected to as incompetent, and as calling for the opinion of the witness, instead of facts. The objection was overruled, and an exception taken on behalf of the prisoner.

The witness answered: "I should judge that he was in a stooping position. It is only a matter of opinion, but I should think probably that he was sitting in a chair, or on the side of the bed, and stooped with his head upon his hands or in some such position."

Question: "In what position would you think he was when the wound on the top of the head was given?"

This question was in like manner objected to, but was allowed, and exception was taken.

Answer: "Probably lying down, either on his back or face. He might have been lying in either position."

Question: " State the amount of force, as near as you can, required to break the scalp or skull ? "

To this the prisoner's counsel interposed the like objecion, and excepted to its allowance.

Answer: " Any man with a heavy instrument, like an axe or club, could inflict such a wound; almost any man would be strong enough to do it. A man is capable of exerting a good deal of force with an axe. From the shape of the bones it would require a good deal of force to do it."

Various testimony was given for the purpose of charging the prisoner with the crime, and, among other facts, it was shown that, during a portion of the winter, he had worked for and lived with the deceased; and some of the evidence indicated that the prisoner, more than any other person, had his confidence. One of the witnesses (Robert Creighton) having testified that the prisoner " lived with Thomas Hand about three weeks; there was no other person living there at the time; I do not know whether Hand had any money," was asked—

" What produce did he have that he sold last fall ? "

And to this question the prisoner's counsel objected as immaterial, and on its admission excepted.

Answer: " Eight or nine tons of hay I know of, and ten bushels of peas; I cannot tell how much he received for them; I know of his selling wood; there was three cords of dry wood for three dollars a cord, and some little green wood—two or three loads probably."

And again, on the examination of a nephew of the deceased, the counsel for the people proposed to inquire whether such nephew, who arrived in this country the previous summer, brought from England and paid to the deceased, in gold, twenty-two sovereigns, and to this the counsel for the prisoner objected, on the ground that it related to a matter too remote in point of time; and excepted to its allowance.

The witness answered: " I gave to Thomas Hand a quantity of gold; it was some time from the 6th to the 10th of July; it was in sovereigns; there were twenty-two; I do not know what

he kept it in ; I delivered it, and he put it in his pocket-book or purse ; I do not know what he did with it after that."

In the cross-examination of one of the witnesses for the prosecution (Patrick Kennedy) he testified, that while the prisoner was at work at the deceased's house (about two weeks after Christmas) he heard a conversation between them about work. The prisoner's counsel inquired " What was it ? " and on objection, stated that he offered to prove that Hand declared he had no money. The testimony was excluded, and exception was noted.

Although other objections and exceptions were made and taken during the trial, the foregoing statement embraces all the rulings that are insisted upon as erroneous by the counsel for the Plaintiff in Error in this Court. On the submission of the case to the jury they returned a verdict finding the prisoner " Guilty of the offence whereof he stands charged in the indictment; " and thereupon the prisoner's counsel moved an arrest of judgment, on the ground that the indictment was in the common law form of indictment for murder, and not an indictment charging murder in the first degree under our statute ; that the indictment was equally applicable to murder in the first and in the second degree, and a verdict of " guilty as charged," was not definite and certain as to the degree of murder of which he was found guilty ; that the Court could not determine, from the verdict, of what degree of murder the jury found the prisoner guilty, and therefore, for want of certainty, the Court could not sentence the prisoner.

The Court held otherwise, and proceeded to sentence the prisoner to death—the punishment of murder in the first degree—and exception was taken on behalf of the prisoner.

On writ of error, the judgment of the Oyer and Terminer was affirmed by the Supreme Court, in General Term, in the Fourth District, whereupon the prisoner, by writ of error, brought the record and proceedings into this Court.

*Charles G. Myers* for the Plaintiff in Error.

*B. H. Vary* for the People.

WOODRUFF, J.—1. In Fitzgerrold *v.* The People, this Court, at the

January Term last past, decided that an indictment charging the prisoner in terms nearly identical with those employed in the present case, is a good and sufficient charge of murder in the first degree. That the statute defining murder in the first degree, murder in the second degree, and manslaughter, has not changed the form of pleading so that an indictment for *murder*, good at the common law, is no longer sufficient. That under such an indictment there may be a conviction of murder in the first degree, or in the second degree, or of manslaughter, according to the description of the act given and proved; and that the statute is not a rule of pleading, but a guide to the conduct of the trial, and to the instructions to be given to the jury; and therefore that a general verdict of guilty as charged, is a conviction of murder in the first degree, and warrants a sentence of death—its legal penalty (Conkey et al. *v.* The People, 5 Parker's Cr. R. 31; Wharton's Cr. Law, § 3048; Harmon *v.* Commonwealth, 12 Seg't & R. 69).

2. It was objected on the trial, in the present case, that the indictment is bad, because it charges the prisoner with the killing of Thomas Hand, alias Thomas Jackson. There is nothing in the suggestion that this created any duplicity; the charge, in no sense of the word " alias," imported the killing of two persons. To give it such an effect would be to construe it as meaning Thomas Hand and Thomas Jackson, which neither its proper Latin signification, nor its English use, would allow. A more plausible suggestion would have been, that it was bad for uncertainty, because it left it doubtful whether the killing of Thomas Hand, or the killing of Thomas Jackson, was charged. But in order to create this doubt it is necessary to read the word as meaning " or," after the word " either," and so make the indictment charge the killing of one of two persons—that is to say, with the killing of either Thomas Hand or Thomas Jackson. But this again is not according to its well understood meaning, as a term in the law long used to avoid a variance or misnomer in pleading. It does not indicate that different persons are intended, but in pleading—both in civil and criminal actions—that the names mentioned are different descriptions of the same person. Counsel for the Plaintiff in

Error is right in claiming that it was formerly employed in pleading in connection with "dictus," and in that connection the charge would import the killing of Thomas Hand, otherwise called Thomas Jackson. And the argument is in substance a concession, that had the pleader used the full expression, "alias dictus," or "otherwise called," the supposed defect would not exist. I apprehend that the use of the single word "alias" to express the whole meaning has so long obtained that it is not uncertain what is the true meaning of the charge, and if not, then there is no just ground for the exception.

Unless there is such uncertainty the objection, even if technically sound, is not of substance, but of mere form, and could in nowise prejudice the prisoner, and therefore neither renders the indictment invalid, nor affects the proceedings (2 Rev. Stat. 728, § 52). The term has become familiar as equivalent to "otherwise called," or "otherwise known as," and may be properly so treated, as having by use in pleadings, in English, acquired that import, as a technical term constantly employed in that sense, without its former Latin companion.

On the argument of the case in this Court the counsel for the Plaintiff in Error has enlarged the objection taken below, and now, after verdict, insists that even if "alias" may be held to import the full meaning, "otherwise called," still the conviction should be reversed, because the alias should follow the true name, and that the indictment here should have charged the killing of Thomas Jackson, alias Thomas Hand, and not the killing of Thomas Hand, alias Thomas Jackson. No such point appears to have been taken below, and no point so purely technical, so void of intrinsic merit, should be permitted to be first raised here, when no possible prejudice could happen to the prisoner by reason of the error, if it were an error. It is by no means clear that if the fact assumed were true, the objection would have any force. Where one had executed an instrument by a wrong surname, it was long since held that he might be sued by such wrong name, "alias dictus" his true name (3 Salk. 238); and it was in the days of very rigid adherence to technicality when it was so held.

In respect to Christian names the rule was otherwise, both in civil and criminal proceedings (3 Salk. 238; 1 Ld. Ray'd, 562). On the other hand, Reid *v.* Lord (4 Johns. 118) is to the effect that the true name is that which precedes the "alias dictus," and does not notice the distinction above stated. But there is another sufficient answer to the objection. It is not found that the true name of the deceased was not Thomas Hand. On the contrary, the verdict finds the prisoner guilty as charged, and if the pleading on its face imports—as the prisoner's counsel now claims it does—that Thomas Hand was the true name of the deceased, and Thomas Jackson a name by reputation only, then the jury have found the prisoner guilty of the murder of Thomas Hand, who by reputation had the name of Thomas Jackson.

If we are called upon to look at the evidence, and say whether such a verdict should be sustained, we cannot say that it should be set aside as against evidence, or that the testimony shows conclusively that Thomas Hand was a fictitious name. During his residence in this country he was known, and only known, as Thomas Hand. He appears to have been in this country twenty-two years. His nephew, who came to this country the summer previous to the murder, testified: "I am a nephew of Thomas Hand, deceased; I was *not much· acquainted* with him in England; I recollect him, that was all; his name there was Thomas Jackson." No other evidence was given to show that the deceased bore the name of Thomas Jackson. The name of his father or mother, brother or sister, or other relative (save the nephew's name), was not proved. All lies in the recollection of one who was not much acquainted with him, whose memory is taxed to go back twenty-two years, and who barely remembers him. On this evidence we cannot say whether the name by which he was thus faintly recollected may not have been assumed. Doubtless the name by which he was known (if the nephew's recollection is correct) in the land of his birth, would seem most likely to be the true name; but we could not disturb a verdict upon such a ground and upon such evidence. Besides, the question does not arise as it did in the cases above cited. Those were

cases in which the Defendant was himself declared against, or indicted, with an alias.   Even there, appearance and plea to the merits waived the error, if any, and after verdict the objection would not avail.   Here, if the true name of the deceased were Thomas Jackson, and the name by reputation Thomas Hand, a description of the deceased as Thomas Hand, alias Thomas Jackson, would not be such a misdescription as to be fatal after verdict.

If, therefore, no error was committed in receiving or rejecting testimony, there is no ground for reversing the judgment.

3. It was not erroneous to reject testimony to the declaration of the deceased, that he had no money.

The question whether the deceased had or had not money in his possession at the time of his death was, no doubt, a material one, as will presently be considered; and it may have been material to show that the prisoner was aware that the deceased had money; but the declaration of the deceased, some weeks before the murder, was not competent evidence that he had no money; it was no more evidence as against the people, or for the prisoner, than his declaration upon any other subject would have been.

I know of no rule which makes the declarations of the deceased, forming no part of the res gestæ, competent evidence, either for or against either party.   It has no analogy to dying declarations, which are received, when made in view of approaching death, as having a sanction equivalent to testimony given under the solemnity of an oath before the Court and jury.

4. Nor was it erroneous to allow proof of sales of produce made by the deceased in the previous fall, or that his nephew had paid to him sovereigns in the previous July.

Proof tending to show that the deceased had money suggests a motive for committing a robbery, and so a motive to take the life of the deceased, if that would facilitate the theft, or contribute to its concealment.   Such a fact formed a prominent circumstance, tending to the conviction of the prisoner, in Gordon v. The People (33 N. Y. 501), and was not suggested as of doubtful admissibility in that case.   And this Court, in Hendrickson v. The People (10 N. Y. 13), went much further in sustaining the admis-

sion of evidence tending, as was claimed, to show a motive for the
commission of the crime charged, by receiving testimony which,
at most, only showed that the prisoner had a diminished interest
in the continuance of his wife's life. It is always a just argument
on behalf of one accused, that there is no apparent motive to the
perpetration of the crime. Men do not act wholly without mo-
tive. On the other hand, proof of motive tends, in some degree,
to render the act so far probable as to weaken presumptions of
innocence and corroborate evidence of guilt.

Whether the time of the possession of money by the deceased
be or be not too remote to render the evidence proper, must de-
pend very much upon the circumstances of each case. The pros-
ecutor here had given some evidence that, about six weeks before
the murder, the deceased had gold, which he desired to sell. The
evidence on this point, which was objected to, was that, in the
previous July, his nephew had paid him gold. This testimony
rendered it probable that it was the gold then received which he
had retained and proposed to sell. It did not appear that he in
fact sold it, but if it had, it would have left some presumption
that he had in his possession the proceeds; and proof of his sales
of produce had a similar tendency. All this evidence was slight
in its bearing on the guilt of the prisoner, but in its nature it was
competent, and it was for the jury to consider and determine its
weight. Had the deceased been engaged in traffic—buying, sell-
ing, and dealing with others frequently—it might not be proper
to go back six months for proof that he received money, unless it
was followed by other evidence showing its retention. But here
the deceased led a solitary life—mingled very little with his fellow-
men. If the testimony did not amount to proof of a miserly habit,
it certainly indicated a habit of living so free from expense that
the jury might well infer that any considerable amount of money
in his possession during the fall, or held by him six weeks before
his death, was for the most part in his possession when he was
killed.

In connection with the other testimony—that the prisoner pro-
posed, at about the time of the murder, to purchase land in the

neighborhood—such proof was in its nature competent, and might properly be submitted to the jury as evidence, though slight, that the prisoner, having the opportunity, had also a motive to the crime. It must be conceded that such evidence should be weighed with extreme caution. It is entirely consistent with the perfect innocence of the accused. Of itself it could by no means warrant a conviction. The prisoner, it appeared, alleged that he had money in Canada with which to make the purchase he talked of; and that may be entirely true. The temptation furnished by the proof in this case would seem wholly inadequate to the commission of the crime. But that, to the upright mind, is true of any pecuniary or other motive of mere gain that can be suggested. Unfortunately, in the history of mankind such motives to crime are sometimes influential, and proof of their existence must be left to the jury to be weighed, whether apparently greater or less, in connection with the other circumstances disclosed by the testimony, and in view of the condition, circumstances, habits, and character of the party on whom such motives are alleged to operate.

5. The admission of the testimony of the Coroner, who was a physician, as to his opinion respecting the position of the deceased when the blows were given which caused the fatal wounds, is far more questionable. He had described the wounds; he had given their position upon the head, their direction, their length, width, and depth. He had been permitted to give, as far as he was able, the shape of the instrument with which the blows were inflicted, and to state that "striking the scalp from above and backward would make such a gash—in a vertical or slanting direction: a blow with a blunt instrument." If any other *fact* was wanting which could guide the judgment in determining the manner of the killing, and which medical or surgical skill could supply, it was competent to inquire further of the witness. Indeed, one of the questions which became the subject of exception here insisted upon, was, I think, clearly competent in that view—viz. as to the amount of force requisite to break the skull. He had not only the skill and knowledge resulting from his professional

familiarity with anatomy, and the structure, thickness, and strength of the human skull generally, but he had the particular knowledge acquired by the examination of the skull of the deceased. That he was competent to speak as an expert of the power of resistance of the skull, and so of the force requisite to break it, as it was in this case broken, seems to me quite clear. But here, I think, was an end of the inquiries permissible to draw from him mere opinions. Having stated all this, he was no more competent to give an opinion as to the position of the body when struck than any other person. One blow was received by the deceased on the left side of the back of the head. How is it possible that a surgeon can tell better than one who is not a surgeon, how the head must be placed so that such a blow can be given? It is entirely obvious that it must be in such a position that it is accessible. In one position it would be easy to reach it; in another it would be difficult; and in yet another it might be impossible. I am not aware that surgeons are experts in the manner of giving blows of this description, or in determining how the head must be placed so as most conveniently to receive them. The form, nature, extent, depth, length, width, and direction of the wound being given, and its precise location on the head, with a general statement of the amount of force requisite to cause it, and the probable shape of the instrument, the jury can judge as well as any one in what position the head or the body probably was when the blow was given. At best, it seems to me, there can be nothing more than a conjecture among several suppositions; but surgical skill has little to do with the inquiry.

Still less was the position of the body, when the blow was given which caused the wound on the top of the head, the proper subject for an opinion by the surgeon. Obviously a blow may be given on the top of the head whenever the top of the head is within reach of such a blow from the assailant; it may be when sitting; it may be when lying down. A short man standing might receive such a blow from one who is very tall. When all the facts are stated, it must necessarily be nothing but conjecture.

And the answer of the witness in this case shows that he could only venture to state that the deceased was *probably* lying down. He was no more competent to infer such probability than the jury were. It is only when the matter inquired of lies within the range of the peculiar skill and experience of the witness, and is one of which the ordinary knowledge and experience of mankind does not enable them to see what inferences should be drawn from the facts, that the witness may supply opinions as their guide. But on what ground it can be said that it requires the peculiar science or professional skill which physicians and surgeons possess, to determine the position in which a man may be struck on the top of his head, I am not able to perceive.

I think, therefore, that the ruling which permitted the answer to those two questions was erroneous. If the position of the body when the blows were struck was material, it should have been left to the jury to infer that position from the facts which tended to show it (The People *v.* Rector, 19 Wend. 569 ; The People *v.* Bodine, 1 Denio, 231 ; Wilson *v.* The People, 4 Parker's Cr. R. 619 ; Jefferson Ins. Co. *v.* Cotheal, 7 Wend. 78).

But under the circumstances of this case this error is of no importance, and furnishes no ground for reversing the judgment. The only possible bearing of the questions and answers lastly adverted to was on the inquiry, whether a murder had been committed. Whether the position of the body, when those blows were given, was erect, reclining, or prostrate, might in some very slight degree bear on the question whether the deceased was injured by an accidental fall, or died by violence inflicted by his own hand; but when once it is assumed that he died by murder, these inquiries become wholly incompetent and immaterial. They have not the slightest bearing on the question *who* committed the crime. Standing, sitting, or lying down, the deceased was murdered, and, in whichever position, it is alike wholly uncertain *who* struck the fatal blow. Other circumstances might point to the prisoner, but these no more pointed to him than to any other human being of strength sufficient to give the blow. It is therefore conclusive, on the immateriality of the errors referred to,

that it appears by the case that the fact of a wilful and deliberate murder was not finally a subject of contest before the jury.

In the beginning of the trial the counsel for the people gave. the evidence referred to. He was then, in the opening of the case, establishing the primary fact that a murder had been committed.

At the close of the testimony, as we are informed by the Judge, in his charge to the jury, no embarrassing distinctions in reference to the nature of the crime were to be considered, and he say s: " The murder that has been committed here is wilful and delibe- rate, *as is conceded on all hands.* The Defendant's counsel *con- cedes* 'that the murder, by whomever committed, is wilful and de- liberate, and such is the charge in the indictment. . . . . . This disposes of many questions, which are often found important and difficult questions for jurors to pass upon; and this leaves you with *only* the duty to say whether the Defendant, who has been in- dicted, is the guilty person who has committed wilful and deliberate murder. . . . The simple question for you to consider is, whether or not this Defendant is the man who committed this murder."

To all this there was no exception. It is entirely manifest (as was indeed expressly stated by the Judge) that the fact of wilful and deliberate murder was conceded. How then could the opinion of the Coroner, that the fatal blows were received by the deceased in one position rather than another, affect the prisoner? He wished no question submitted to the jury on which those opinions could have any possible bearing.

If I could see that such opinions could in the slightest degree, or by any possibility, have had any influence on the question, who struck the blows, the prisoner should not be suffered to bear that influence or its consequences. I am not able to perceive that it could have any such bearing, or to find any ground for saying that the error is not wholly unimportant. For these reasons I think the judgment below should be affirmed, and the record remitted, that the judgment may be carried into due execution.

Grover, J.—It was decided at the last January Term of this Court (Fitzgerrold v. The People) that a general verdict of guilty,

rendered upon a common law indictment for the crime of murder, authorized a judgment against the Defendant for the crime of murder in the first degree, under the statute of the State. This disposes of the principal question relied upon for the reversal of the judgment in the present case.

The more material questions arising upon other exceptions taken during the trial will be considered. It is manifestly immaterial, when a person is known by two names, and the pleader, for greater certainty, deems it necessary to aver such fact in his pleading, which of the two names is first stated, and also, in such case, which was the real name, and which was afterward acquired. It is sufficient if the pleading designates the names by which the person intended may be known with certainty, irrespective of the priority of the statement.

It is insisted that the usual alias cannot be used in an indictment, for the reason that it is not English, and also, if this be not so, that the word does not, with sufficient certainty, convey the idea that the party was also known by the name thereafter expressed.

As to the first point, it may be remarked, that the word has been incorporated into the English language, and as such will not only be found in the principal dictionaries, defined with precision, but is also in use by writers, and in conversation, as an English word having the meaning given by lexicographers. That meaning is, where it appears between the names of a person, that the person is known by both names. That is a sufficiently certain averment of such fact in an indictment.

The opinion of the surgeon as to how the body of deceased was got into the position in which it was found, and as to the position of the deceased when the blows upon the head were inflicted, was incompetent.

The witness testified that it was mere opinion, unaided by his knowledge or skill as a surgeon. He was therefore no more competent to give an opinion upon these questions than any other person.

Were these questions, or either of them, in any possible view, material upon the trial, the exceptions to the evidence would have been well taken. I can see no possible materiality in either. The

3

evidence precluded every possible idea of suicide, and also every idea that the blows were inflicted in self-defence.

It being an unquestioned case of murder, by whomsoever inflicted the blows, it was wholly immaterial how the murderer got the body into the cellar, and placed it in the position as found after death, or whether the deceased was sitting, in a stooping posture, or in any other position, when the blows were given.

The evidence having no tendency to prejudice the Defendant, the exception was not well taken. The evidence of the quantity of produce sold by the deceased, the fall previous to the murder, was competent. The prosecution had the right to show that the motive of the murderer was the hope of gain. This evidence had a tendency to show that the motive of the murderer was the hope of gain.

This evidence had a tendency to show that the deceased had money or other valuable property in his house, where he lived alone.

The same remark is applicable to the testimony of his nephew, that he brought gold from England, and delivered it to the deceased. The time that had elapsed after such receipt of gold by the deceased was for the consideration of the jury.

It was not so long that the Court could determine that it had no tendency to show that deceased, at the time of the murder, had money or other valuable property in his possession.

The declarations of the deceased as to the money in his possession were properly excluded. There was nothing to obviate the objection that they were mere hearsay. The opinion of the witness who conversed with the prisoner while in jail, that he was innocent, was properly excluded. This requires no examination.

The circumstances under which he had the conversation with the Defendant, proved by the District-Attorney, could not have any effect upon the point in question.

I have examined the remaining exceptions, and none of them are well taken.

The judgment appealed from must be affirmed.

All affirm, except MASON, J., *not voting.*

Affirmed.