UNITED STATES of America,
Appellant,

v.

Lawrence T. DAY.

UNITED STATES of America,
Appellant,

v.

Eric J. SHEFFEY.

Nos. 77–2020, 77–2021.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 10, 1978.

Decided Dec. 8, 1978.

As Amended Jan. 23 and Feb. 14, 1979.

Rehearing Denied in No. 77–2020
Jan. 11, 1979.

Roger M. Adelman, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., John A. Terry and Michael W. Farrell, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

John E. Drury, Washington, D.C. (appointed by this court) for appellee in No. 77–2020.

John A. Shorter, Jr., Washington, D.C. (appointed by this court) for appellee in No. 77–2021.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

Opinion for the court filed by MacKINNON, Circuit Judge.

Opinion filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting in part.

MacKINNON, Circuit Judge:

Appellees Lawrence T. Day and Eric J. Sheffey were charged in a seventeen-count indictment which may generally be considered as involving four separate criminal enterprises. The counts in the indictment cover events that were alleged to have occurred on December 14, 15, 16, and 17, 1976.

The first crime is alleged in count 1 and charges Day, on or about December 14, 1976, with the interstate transportation of a stolen motor vehicle from Maryland to the District of Columbia.[1] The second group of crimes alleged that Day and Sheffey on December 15, 1976 used an automobile without the owner's consent[2]; and committed armed robbery (counts 3–6)[3]; counts 7 and 8 charge assault with a dangerous weapon.[4]

The indictment next charges that on December 16, 1976 both appellees violated the Federal Firearms Act by making four sawed-off shotguns: counts 9 through 12 set forth these charges.[5] The last five counts charge offenses allegedly committed on December 17, 1976: count 13 charges appellees with first-degree murder of Gregory Williams while armed[6]; count 14 charges appellees with second-degree murder of Williams while armed[7]; count 15 charges appellees with unlawful possession of five sawed-off shotguns[8]; and counts 16 and 17 charges Sheffey with being an accessory after the fact to first-degree (count 13) and to second-degree (count 14) murder.[9]

On April 19, 1977, the district court, acting upon motions made by appellees, severed counts 1 through 8 which related to the forceful taking on the street of an automobile and a robbery the next day of a sporting goods store, from counts 9 through 17. A trial of both appellees on counts 1 through 8 was conducted in April, 1977. At the conclusion of the Government's evidence, Day entered a guilty plea to counts 1 through 5 and count 7.[10] The next day, appellee Sheffey was acquitted by the jury on all counts.

Trial of both appellees on the remaining counts of the indictment was set for November 7, 1977. By motion, the Government requested that the court admit in evidence at the trial of counts 9 to 17 "the evidence adduced at the first trial of the robbery and other related offenses."[11] On October 25, 1977, the district court ruled that evidence of "other crimes" could not be introduced at the second trial on the last nine counts.[12] By motion, the Government also requested the court to admit certain testimony of the proposed witness Kerry Mason regarding five different acts and statements that the victim of the murder, Gregory Williams, made shortly before he

---

1. 18 U.S.C. § 2312.

2. 22 D.C. Code § 2204.

3. 22 D.C. Code §§ 2901, 3202.

4. 22 D.C. Code § 502.

5. 26 U.S.C. § 5861(b).

6. 22 D.C. Code §§ 2401, 3202.

7. 22 D.C. Code §§ 2403, 3202.

8. 26 U.S.C. § 5861(d).

9. 22 D.C. Code § 106.

10. An oral motion for judgment of acquittal was granted as to counts 6 and 8.

11. Govt. Memorandum, filed July 6, 1977, at 1.

12. Tr., Oct. 25, 1977, at 67–70.

was killed.[13] On November 7, 1977, the court ruled that one of the five statements was admissible but that four of the five were not.[14] The Government appeals both rulings of the district court, i. e., the other crimes ruling and the rulings involving the acts and statements of the decedent. For the reasons and to the extent set forth below, we affirm the October 25 ruling with respect to defendant Sheffey, but we reverse with respect to defendant Day. In addition, for the reasons and to the extent set forth below, we partly affirm and partly reverse the ruling of November 7.

I

### THE OTHER CRIMES EVIDENCE

The Government seeks to use the evidence of "other crimes" adduced at the trial of counts 1 through 8 in the trial of both Day and Sheffey on the remaining counts. Thus, the first issue in the case is whether the district court erred when it ruled that the evidence of the "other crimes" charged in counts 1 through 8 was not admissible as evidence against both Day and Sheffey in the pending trial of counts 9 through 17.

A. *The Evidence Adduced at the Trial of Counts 1 Through 8*

On December 14, 1976, in Hyattsville, Maryland, Orlando F. Plater at about 11:30 p. m. was robbed of his 1974 Buick Electra automobile by two men with a shotgun. The Buick was a two-door green vehicle with a tan vinyl top. At the first trial involving counts 1 through 8, Plater identified appellee Day and Gregory Williams as the men who had stolen his car.

The day following the taking of the auto, on December 15 at about 5:30 p. m., an Irving's Sports Shop store in the northeastern section of Washington, D.C. was robbed by three men. Four employees and some customers were in the store. One of the employees testified that as he looked out the store window, a Buick Electra drove up and parked directly in front of the store. *Three men* got out of the car and entered

the store, two of them brandishing shotguns. Persons in the store were robbed of their money and jewelry, and other articles—including several full-length shotguns—were taken from the store. Two of the victims of the robbery identified Day as one of the two men who held shotguns. Two of the victims also indicated that Williams looked like one of the robbers. The Government contended that Sheffey was the third robber, but he was not identified as such by any witness at the scene.

On December 17, 1976, at about 4:00 a. m., shortly after the murder of Williams, police officers entered a house at 2817 26th Street, N.E., in Washington D.C. Day was found asleep in a bedroom on the first floor of the house. Sheffey was found asleep in a separate bedroom on the same floor. Both men were arrested. Among the items seized in the room where Day was arrested was a shotgun taken in the robbery of Irving's Sports Shop and shotgun shells. Four or five other guns, all sawed-off, were recovered from a trunk on the rear porch of the house. The Green Buick Electra owned by Mr. Plater was parked around the corner from the house. The keys to the car were found in the room where Day was arrested. Returning to the premises with a search warrant, police officers recovered a ring and wristwatch taken from one of the individuals in the robbery of Irving's Sport Shop on December 15. The watch was found on the top of a dresser in the room where Sheffey was arrested. During the search, one of the women living in the house turned over a ring, stating that Day had given it to her. Hacksaws and hacksaw blades were found in a closet in the bedroom where Day was arrested; a bag located immediately outside the house with sawed-off portions of the shot-gun stocks and barrels was also found. One of the sawed-off shotguns recovered from the trunk on the back porch had a latent finger print on it which matched Sheffey's right middle finger.

At trial, Tammi Thompkins, a friend of Sheffey, testified as a Government witness

---

13. *See* Govt. Memorandum, filed Aug. 10, 1977, at 2.

14. Tr., Nov. 7, 1977, at 120–24.

that she had a conversation with Sheffey on December 20, 1976 about some shotguns. She said that Sheffey told her he obtained the guns in a robbery of a gun shop about four or five days before. According to Miss Thompkins, Sheffey told her that he drove the car in the robbery.

At the conclusion of the Government's evidence, Day moved for judgment of acquittal, which was granted as to counts 6 and 8 but denied as to the remaining counts. Day then withdrew his not-guilty plea and pled guilty to counts 1 through 5 and count 7.

Sheffey presented a factual defense to the charges against him. He denied participating in the robbery in any way. He testified that he was a close, personal friend of Sheila Thomas, one of the residents of the house, and that he spent an average of three nights a week there. He testified that he was introduced to Day by one of Thomas' roommates, who introduced Day as her boyfriend. At the time of the robbery, Sheffey testified that he was at Thomas' home; she corroborated this testimony. He further testified that late in the evening of the robbery, Day and a person he introduced to Sheffey as "Slick" came to the Thomas residence in a white Nova automobile; "Slick," who turned out to be Williams, showed Sheffey two guns in the trunk of the car; Sheffey handled the guns, looked at them, and gave them back to Williams. Sheffey testified that he did not know any guns were in the house until he learned that the police had seized some at the time of his arrest. Sheffey testified that he knew nothing about the watch on the dresser in his room. He also stated that he had a conversation with Tammi Thompkins on December 20, 1976 at the D.C. Jail, but he denied that he told her he partici-

pated in the robbery at Irving's Sports Shop.

The jury acquitted Sheffey of all charges.

B. *The Admissibility of "Other Crimes" Evidence With Respect to Defendant Sheffey*

The first trial, as noted above, involved counts 1 through 8 of the indictment. Only five of the counts were given to the jury, and the jury rendered a judgment of acquittal for Sheffey on all of the counts. The Government seeks to have the evidence supporting the counts considered in the first trial admitted against Sheffey in the second trial. The district court concluded that admission of evidence against Sheffey of such other crimes "would be most high[ly] prejudicial against him."[15] Accordingly, the district court ruled that such evidence was inadmissible against Sheffey, and we affirm that result to the extent hereinafter set forth.

■ The parties did not address in their briefs or at oral argument how the doctrine of collateral estoppel might affect subsequent use of the evidence against Sheffey.[16] Our analysis of the record and the relevant precedents convinces us that the doctrine controls Sheffey's case. Collateral estoppel is "an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970).[17] As the Supreme Court stated in *Ashe*, collateral estoppel has been an "established rule of federal criminal law" at least since *United States v. Oppenheimer*, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916).

---

15. Tr., Oct. 15, 1977, at 69.

16. The district court did not rely on collateral estoppel as a basis for its decision. This does not prevent us, however, from relying on the doctrine for disposition on appeal. *See California Bankers Assn. v. Shultz*, 416 U.S. 21, 71, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *Securities and Exchange Comm. v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Ryerson v. United States*, 312 U.S. 405, 408, 61

S.Ct. 656, 85 L.Ed. 917 (1941); *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937).

17. Judge Robb has explained the collateral estoppel doctrine in virtually identical terms:

A short statement of [the collateral estoppel] rule as applied to criminal cases is that when a question of fact essential to the judgment is litigated and determined in a criminal prose-

*Id.; see Turner v. Arkansas*, 407 U.S. 366, 92 S.Ct. 2096, 32 L.Ed.2d 798 (1972).

█ In *Green v. United States*, 138 U.S. App.D.C. 184, 426 F.2d 661 (1970), we held that admission against defendants of evidence that had been the subject of a count of which defendants had been acquitted in a previous trial was inadmissible in the second trial under the doctrine of collateral estoppel. In *Green*, the first trial for various offenses relating to a robbery ended in a mistrial when the jury could not reach a verdict. However thereafter, the trial judge directed a verdict of acquittal on one of the counts, unauthorized use of a vehicle in violation of D.C. Code § 22–2204. At a second trial, defendants were convicted of robbery and assault.[18] Over appellant's objection that they had been acquitted of the count concerning unauthorized use of a vehicle a witness was permitted to testify at the second trial that on the evening before the robbery, he and the appellants stole the car which was the subject of the count and that they used the same car in the robbery. This testimony was repeated in the prosecutor's summation and relied on in his argument. We said:

> Under familiar principles relating to collateral estoppel, the admission of this evidence was error, and in the circumstances of this case the error was not harmless.

138 U.S.App.D.C. at 185, 426 F.2d at 662. The principle followed in *Green* has a firm basis in the law of this circuit. *Lee v.*

United States, 125 U.S.App.D.C. 126, 368 F.2d 834 (1966); *Laughlin v. United States*, 120 U.S.App.D.C. 93, 344 F.2d 187 (1965); *cf. Mahoney v. United States*, 137 U.S.App. D.C. 3, 420 F.2d 253 (1969).

█ In the first trial here, the jury considered whether Sheffey was guilty of the use and operation of the stolen green Buick on December 15, 1976 and whether Sheffey was guilty of the robbery at the Irving's Sports Shop on the same day. The jury acquitted Sheffey of all charges connected with these events. The jury's acquittal is a final and binding determination that Sheffey was not guilty of those charges. Hence, in a second trial the Government cannot introduce evidence with the aim of contradicting any ultimate fact concluded by that judgment. We are convinced that the ultimate facts upon which the Government relies to support its claim that Sheffey is guilty of the offenses charged in the second trial are the same ultimate facts that the jury in the first trial found did *not* exist. Hence, to the extent that the Government seeks to use evidence introduced at the first trial to support a claim against Sheffey contrary to the facts essential to the judgment in that case, it is collaterally estopped from doing so.[19]

## C. The Admissibility of "Other Crimes" Evidence With Respect to Defendant Day

The circumstances of Day's situation are markedly different. As noted above, Day

---

cution, the determination is conclusive between the parties in any subsequent prosecution, *although the offenses be different*. [Emphasis added.]
*Mahoney v. United States*, 137 U.S.App.D.C. 3, 4, 420 F.2d 253, 254 (1969).

18. The fact that the second trial in *Green* involved the same offenses as the first trial does not render *Green* inapplicable to this case, where the offenses in the second trial differ from those adjudicated in the first trial. As Judge Robb stated in *Mahoney v. United States*, 137 U.S.App.D.C. 3, 4, 420 F.2d 253, 254 (1969), a final determination of any question of fact essential to the judgment is conclusive "in any subsequent prosecution, although the offenses be different." *See* note 17 *supra*.

19. In our opinion, the facts on the record show that the evidence objected to by Sheffey was

essential to the judgment on the issues in the trial of counts 1 to 8 as they pertain to him. Conceivably, there may have been some circumstance in the first trial that led that jury to conclude that all of the requirements for guilt had not been demonstrated beyond a reasonable doubt. That circumstance may have had nothing at all to do with the question of Sheffey's presence at the scene of the crime, *i. e.*, identity, which is one of the particular issues in the second trial on which the other crimes evidence would be probative. Yet we are convinced on the record presented here that the requirements for invocation of the collateral estoppel doctrine are met to the extent indicated in the text of the opinion.

Also, if Federal Rule of Evidence 403 were the sole ground for exclusion, the mere fact of acquittal would not be sufficient by itself to demonstrate prejudice. While the jury's ver-

moved in the first trial for judgment of acquittal, which was granted as to counts 6 and 8 but was denied as to the remaining counts 1 to 5 and 7.[20] Thereafter, he pled guilty to the remaining counts. In denying the Government's motion to admit evidence of "other crimes," the district court said that the Government was seeking to show that "there was a dispute [between the decedent and Day], a dispute over guns, a dispute over certain clothing," and the court was not satisfied "that there is a relationship between the robbery . . . [and] what he is actually endeavoring to show, namely, that there was ill will, a dispute or controversy between the decedent and the Defendant Day."[21] The court did not specifically state, as it did with respect to Sheffey, that the evidence was prejudicial, but instead decided that the evidence was not relevant within the applicable rules of evidence to show a dispute which led to Williams' death.

Two rules of evidence are pertinent to the district court's ruling. Rule 401 of the Federal Rules of Evidence provides:

"Relevant evidence" means evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. (Emphasis added.)

Rule 404(b) directly addresses the admissibility of "other crimes" evidence. That rule provides:

(b) Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of *motive*, opportunity, *intent*, preparation, *plan*, knowledge, *identity*, or absence of mistake or accident. [Emphasis added.]

In *United States v. James*, 181 U.S.App. D.C. 55, 555 F.2d 992 (1977), Judge Robinson traced the history of Rule 404(b)[22] and then concluded:

As illuminated by its legislative history, [Rule 404(b)] countenances admission of "bad acts" evidence that is relevant to any material issue in the case except to show the likelihood that, having once fallen into sin, a second slip is likely.

181 U.S.App.D.C. at 61–62; 555 F.2d at 998–99.[23] Of course all evidence of other crimes, may reflect on the character of the accused but that does not make such evidence inadmissible. As *Underhill's Criminal Evidence* (6th ed. 1973) states:

[E]very fact or circumstance tending to throw light on the issue is relevant . . . An exception to the admissibility is made where the *sole* relevancy is to the defendant's character or to his propensity toward crime.

*Id.*, § 5, p. 7. *McCormick on Evidence* (2d ed. 1972) quotes the Model Code of Evidence Rule 311 to the same effect:

". . . evidence that a person committed a crime or civil wrong on a specified occasion is inadmissible as tending to prove that he committed a crime or civil wrong on another occasion if, but only if, the evidence is relevant *solely* as tending

---

dict is relevant to the Rule 403 inquiry, it is but one circumstance to be considered in that analysis. *See United States v. Rocha*, 553 F.2d 615 (9th Cir. 1977). *See also United States v. Jones*, 155 U.S.App.D.C. 88, 476 F.2d 533 (1973); *United States v. Juarez*, 561 F.2d 65, 70 (7th Cir. 1977). However, because we consider ourselves bound by *Green*, we do not reach this issue. *See* cases cited in note 16 *supra*.

**20.** Count 6—Robbery on December 15, 1976 of Hazel Neal. Count 8—Assault on December 15, 1976 of Kevin Mayfield with a sawed-off shotgun.

**21.** Tr., Oct. 25, 1977, at 69–70.

**22.** 181 U.S.App.D.C. at 61–62 n. 38, 555 F.2d at 998–99 n. 38.

**23.** Judge Weinstein, quoted by Judge Robinson in his footnote 38 in *James*, states the rule as follows:

Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect of character; a man with such a defect of character is more likely than men generally to have committed the act in question.
2 J. Weinstein & M. Berger, Evidence ¶ 404[08], at 40 (1975).

to prove his disposition to commit such a crime or civil wrong or to commit crimes or civil wrongs generally.", approved in *Swann v. United States*, 195 F.2d 689, 690 (4th Cir. 1952) and in *State v. Scott*, 111 Utah 9, 175 P.2d 1016, 1022 (1947). See also *Lovely v. United States*, 169 F.2d 386, 388, 389 (4th Cir. 1948); *Gorski v. State*, 1 Md.App. 200, 228 A.2d 835 (1967). McCormick, Evidence § 190, at 447 n. 32 (2d ed. 1972) (emphasis added).

■ The district court appeared to take the position that the only connection between the "other crimes" and counts 9 to 15 was the existence or non-existence of a dispute between Day and the decedent. Simply put, it is the Government's theory that Day and the decedent collaborated in the robbery of the Plater automobile and Irving's Sports Shop. Thereafter, Day and the decedent became embroiled in a dispute about the division of the proceeds and other matters, and that this dispute was the precipitant of Williams' murder, which is the subject of counts 13 and 14. The Government's position is that the evidence connected with the stealing of the Plater automobile and the robbery of the sporting goods store, which are the "other crimes," tends to show, *inter alia*, a motive for the killing. "*Motive*" is one of the enumerated reasons contained in Rule 404(b) for which "other crimes" evidence is admissible. The district court focused on the Government's use of the evidence to show motive and appeared to rely on that focus in finding that the evidence was *not relevant* on any of the counts. From our examination of the record we are convinced that the district court's conclusion that the other crimes evidence was irrelevant, and therefore inadmissible as to all the counts in the trial of Day, was clearly erroneous.

The focus of the October 25, 1977 hearing on the admissibility of the other crimes evidence concerned the two murder counts, but the allegations of the other indicted offenses cause the considerations affecting admissibility of the other crimes evidence with respect to the *firearms violations counts* to be somewhat different from those with respect to the murder counts. We therefore discuss these considerations separately.

### 1. The Firearms Counts

■ With respect to the firearms violations in counts 9, 10, 11, 12, and 15, we believe that the evidence of Day's participation in the Irving's Sports Shop robbery is clearly relevant.[24]

Day pled guilty, *inter alia*, to count 3 of the indictment, which alleged robbery of Irving's Sports Shop and the theft of the shotguns. The Government is expected to attempt to show at the second trial that the serial numbers on the shotguns found by the police in the house on 26th Street where Day was arrested match the numbers on the guns stolen by Day from Irving's Sports Shop. Also, the Government is expected to attempt to present testimony from a firearms expert that the sawed-off portions of the stocks and barrels that were found outside the house on 26th Street match the shotguns found by the police in the house. The evidence that Day participated in stealing the shotguns tends to show that it was he who was in possession of the same shotguns (count 15) which were at the house when he was arrested there and that he had participated in sawing off the barrels and stocks (counts 9 to 12). At the least such evidence tends to show that he furnished the guns knowing they would be sawed off and that he was thereby guilty of aiding and abetting the offenses charged in counts 9 to 12 which offenses are alleged to have taken place within a short space of time after the theft which Day has admitted. The shortness of the interval of time between the theft of the guns and their shortening and use tends to indicate that the plan was to steal the guns, and saw them off and then use them. Thus the evidence

24. The Government asserts in its brief and at oral argument that at the trial of the murder and weapons counts of the indictment, it will not be able to produce a single eye-witness who can make an in-court identification of the murderers or who can give testimony as to the making or personal physical possession of the sawed-off shotguns. Govt. Br. at 13–14.

that Day participated in the Irving's Sports Shop robbery is clearly relevant on the issue of identity, i. e., as indicating the person who possessed the shotguns, or who actually sawed them off or aided and abetted such offense. We thus conclude that it was an abuse of discretion amounting to clear error for the district court to rule that such evidence is not relevant to those offenses in the trial of Day.

■ Furthermore, showing *how* the guns were acquired (stolen) is relevant to Day's plan and intent to commit the crimes alleged in the firearms counts. If guns are purchased, they are easily traced to the purchaser. But if guns are stolen, no buyer is identifiable. Thus stealing an article conceals the identity of the possessors by making it difficult to trace the article to the thieves. Evidence of the prior theft of the articles used in the subsequent crimes is therefore relevant and admissible because, in addition to tending to identify Day as the possessor of the guns, it tends to prove that he had the intent to use the stolen guns to commit some subsequent offense or offenses which would be difficult to trace to him since under this plan there would be no regular record that he had acquired the guns. Thus, he could commit the subsequent crimes of sawing off the shotguns and using them in criminal activities and feel reasonably safe that the guns could not be traced to him through any documents that are originated when a gun is purchased in the regular manner at a store. Therefore, showing *how* the guns were acquired is also relevant to Day's criminal *plan* and intent.[25]

■ Part of the evidence produced at the first trial by the Government to identify Day as a participant in the theft of the shotguns indicated that Day participated in the theft of a green Buick Electra from Plater the day before the robbery and that this automobile was used in the robbery of Irving's Sports Shop. If the Government produces evidence at the second trial that a

**25.** The dissent contends that identity can be proved without referring to instances of prior criminality. We note that the other crimes evidence is also relevant to intent, a separate basis for admission specifically noted within Rule 404(b).

As a general proposition, it is proper to admit only a fact that is an ingredient of the crime when that limited admission will serve the Rule 404(b) purpose without admitting the fact of the other crime. However, that proposition and the cases which support it are not applicable here. In *United States v. Speltzer*, 535 F.2d 950, 956 (5th Cir. 1976), the court held that in light of defendant's *sworn admission* of the conviction and confinement elements of the offense of escape from federal custody, it was reversible error to introduce, over objection, the *entire certified copy* of the prior judgment of conviction of *bank robbery*. The nature of the prior crime had nothing to do with the crime for which the accused was being prosecuted. In *United States v. Rice*, 550 F.2d 1364 (5th Cir.), *cert. denied*, 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977), the court held it was error in a prosecution for conspiracy to import, possess, and distribute marijuana to permit testimony that an alleged coconspirator "trade[d] guns for dope" with defendant. The interjection of the reference to "trading guns" bore no relevance whatsoever to any element of the Government's proof of the crimes charged and was clearly inflammatory. 550 F.2d at 1372. Obviously, the holdings in cases such as these are not applicable to a case where the other crimes testimony is relevant to prove motive and such essential elements of the crime as identity and intent.

As for *United States v. Durcan*, 539 F.2d 29 (9th Cir. 1976), *see* dissent at note 24, we disagree with the reasoning in that case and are not bound by it in any respect. In *Durcan*, the court held in a smuggling prosecution that there was "no need to prove how the items were acquired and that the introduction of the evidence concerning the burglaries was error." 539 F.2d at 30. Judge Choy disagreed with this attempt to restrict the Government's proof because "[e]very lawyer knows the foolhardiness of relying solely on inference when positive evidence is available." 539 F.2d at 30–31 n. 1. The majority in its dictum in *Durcan*, however, overlooks the fact that the prosecution was also required to prove that the intent of the accused was to smuggle the stolen goods (which included a camera bearing manufacturer's numbers). On this element of the offense, the proof that the goods were *stolen* in Canada was strongly probative. Since the goods were stolen, the accused did not wish to declare them at the border because the disclosures that the declaration would require would permit the police to trace the stolen goods to the accused. Hence, the *intent* to smuggle is supported by proving the theft. This dictum in *Durcan* is thus in error and its fallacious reasoning is equally apparent here.

Buick Electra or car resembling same was used in the robbery of the sporting goods store, it may attempt to link Day and Williams with that automobile by introducing evidence that they stole the car from Plater the day before the robbery. To this may be added testimony that the car was parked near the house where Day was arrested, that a discharged shotgun shell of the same gauge of the shotguns stolen in the robbery of which Day was convicted was found in the car, and that the keys to the car were found in the room where Day was arrested. Such proffered testimony would be relevant as tending to prove identity and motive, i. e., to identify Day as one of the persons who stole and was in possession of the weapons, including the murder weapon, that are the subject of the firearms counts in the second trial (counts 9 through 12 and 15). The *theft* of the car, however, is not necessary to prove identity—that can be proved by evidence that Day merely had prior possession of the car. In our discussion of the murder counts we deal further with the relevance and admissibility of this testimony that Day *stole* the car.

### 2. The Murder Counts

With respect to the murder charges in counts 13 and 14, we think that the other crimes evidence (theft of the car and the shotguns)—putting aside temporarily the question of motive—is probative on the questions of *identity* and *intent,* two of the justifiable bases of admissibility that are specifically listed in Rule 404(b). In the homicide counts, however, the considerations concerning relevancy of the other crimes evidence are somewhat different from the firearms counts.

Independent of any other crimes evidence, it is expected that the Government will attempt to show: (1) that Williams was killed by a charge from a shotgun; (2) that Williams had Type-O blood; (3) that a shotgun which had Type-O blood on it was recovered from the house in which Day was arrested; (4) that a pair of pants spotted with Type-O blood, a shotgun stolen from the sporting goods store, and shotgun shells

were recovered from Day's room; (5) that a green Buick Electra with Type-O blood on its exterior and an expended shotgun shell in its interior was found around the corner from the house in which Day was arrested; (6) that the discharged shotgun shell found in the green Buick was fired from the bloodied shotgun found in a trunk on the porch of the house in which Day was arrested; (7) that the keys to the Buick were on the dresser in the room in which Day was arrested.

If the Government is permitted to present evidence showing that Day participated in the robbery of Irving's Sports Shop and the theft of the Plater automobile, then it is expected that the Government would attempt to argue: (1) that the shot which killed Williams was fired from the bloodied shotgun; (2) from within the green Buick Electra which was later found with Type-O blood and a discharged shotgun shell; and (3) that Day had stolen the car, driven it from Maryland to the District of Columbia, had the keys in his possession, and had stolen and possessed the shotgun from which the expended shell in the car was fired. From these alleged facts (and others), the Government would ask the jury to infer that Day was the man who fired the shot from inside the car with intent to kill Williams, according to his preconceived plan and that a motive for the murder was to acquire exclusive possession of the shotgun and Buick which had been stolen jointly with Williams in the two robberies.

■ Essentially, the question here is whether the Government, based upon evidence *independent* of the other crimes evidence, can lay a foundation upon which the other crimes evidence can properly be admitted within the strictures of Rule 404(b). If the Government can produce evidence tending to show that one of the stolen shotguns was used in the homicide, then the Government should be allowed to offer evidence that Day participated in the robbery of the Irving's Sports Shop and thereby came into possession of the shotgun. Such evidence would be probative on the issue of *identity*, and would thus meet the require-

ments of Rule 404(b). Such evidence would also be probative on *plan* and *intent.* Showing how and when the guns were acquired tends to prove that Day planned in advance to use them for illegal purposes, such as sawing them off (discussed above) and possibly committing murder with one of them, as he would then be able to conceal his participation in the subsequent crimes through the use of stolen guns that could not be traced to him through regular purchase records.

▮ If the Government can produce evidence that Williams was shot from a Buick Electra or an automobile resembling same, then the evidence of the *theft* of the Plater car and the subsequent interstate transportation from Maryland to the District of Columbia on December 15, 1970 which places Day in possession of a Buick Electra, would be relevant.[26] If such foundation is laid, then under Rule 404(b) the evidence of the theft of the guns and the car, in addition to being admissible to prove motive, would also be relevant and admissible to prove *identity, plan and intent* on the homicide counts. In the language of Rule 401, such evidence tends to make the existence of a fact consequential to the determination of the action more probable. Placing Day in possession of the Buick is relevant on the issue of identity. Evidence that Day knowingly used the *stolen* car in the commission of the homicide is relevant as to his *plan* and of his *intent* to kill Williams. Use of the stolen car in the commission of the murder tends to prove that Day planned the murder in advance and *planned* to conceal his identity in the commission of the crime by using a *stolen* car to drive to the scene of the crime and to effect his getaway. It would have been foolhardy for Williams' murderer to use a car in the commission of the murder that could be traced to him or

any other accomplice. In an attempt to better conceal their identity, criminals very frequently use recently stolen cars because such cars can be traced to them only with great difficulty. Therefore the theft and use of a stolen car in a subsequent offense is some evidence of the prior *intent* of the thief to commit the subsequent crimes. As previously stated, it is also relevant as to his motive.

▮ Testimony that Day and Williams stole the shotguns and Buick in robberies and that the guns and the car were in Day's possession is also relevant and admissible as tending to prove that a *motive* for Day's killing of Williams was pecuniary gain so he could acquire sole permanent possession of such stolen property by excluding Williams as a claimant thereto. The desire to possess money or property is a common circumstance that motivates one to attempt to kill another. 1 Wigmore on Evidence 330 (3d ed. 1940). Motive is a state of mind that is shown by proving the emotion that brings it into being

> . . . as a circumstance showing the probability of appropriate ensuing action [and] it is always relevant . . . It has occasionally been said that the superfluousness of the evidence [of motive] and the possible unnecessary prejudice it might create against the defendant, require its exclusion; but this seems an unwise rule.

1 Wigmore on Evidence § 118 at 558, 561 (3d ed. 1940).

> Courts have therefore always been agreed that in general no fixed negative rules can be made; that no circumstance can be said beforehand to be without the power of exciting a given emotion; and that, in general, *any fact may be offered* which by possibility can be conceived as

**26.** A problem that the Government will encounter under this theory of admissibility is that Mason told the police and testified before the grand jury that the murderer was in a 1969 or 1970 red Cadillac with a hard top. Before the grand jury, he testified that he did not see a Buick Electra or any green car at all at the scene of the homicide. J.A. 43, 56–57. The Government must lay a proper foundation for the admission of evidence of the use of the Plater automobile in the robbery. On the record to date the existence of Type-O blood on the exterior of the Buick Electra, and finding the discharged shotgun shell inside the car, both speak to this point. This may be sufficient evidence to identify the car as the one used in the murder and to support the admission of the evidence of its theft.

*tending with others towards the emotion* in question:

1850 Parsons, J., in *Johnson v. State*, 17 Ala. 618, 627: "[The commission of the murder by someone having been established], every ground from which a motive could arise may be proved against him [the defendant]. . . .. With regard to the grounds from which a motive may be inferred, we may remark that the law has never limited them and never can limit them in number or kind."

2 Wigmore on Evidence § 389 at 329 (3d ed. 1940).

Courts are often called upon to rule upon the admissibility of various circumstances. It is to their reproach that they heed the majority of these calls. There is in most of the rulings no reason for the slightest doubt of the propriety of the evidence. The extreme vagaries and the desperate pugnacity of many of those who take on themselves the defence of criminals have raised questions which ought to have been silently ignored by the Courts,—a treatment which would tend much to the discouragement of crime and the lightening of the profession's burden of precedents.

The *criminality* of the circumstances involved in proof of the motive has no doubt often been the ground of objection, the character-rule (*ante*, § 194) being invoked in exclusion. But it has already been seen (*ante*, § 216) that the fact that the circumstance offered involves also *another crime* by the defendant charged is in itself no objection, if the circumstance is relevant for the present purpose.

*Id.,* at 330 (emphasis in original). To the same general effect as the foregoing is the discussion in *Moore v. United States,* 150 U.S. 57, 14 S.Ct. 26, 37 L.Ed. 996 (1893), of the admissibility of *circumstantial evidence* to prove motive in a criminal offense. Evidence of the criminal partnership and the stolen property that it netted constitute bits of circumstantial evidence from which a jury might infer motive; and there is no requirement that motive must be first proved by direct evidence before circum-

stantial evidence of motive becomes relevant and admissible. In *Moore* the Court said:

It was said by Mr. Justice Clifford, in delivering the opinion of this Court in *Castle v. Bullard,* 23 How. 172, 187 [16 L.Ed. 424] that "whenever the necessity arises for a resort to circumstantial evidence, either from the nature of the inquiry or *the failure of direct proof* [emphasis added], objections to testimony on the ground of irrelevancy are not favored, for the reason that the force and effect of circumstantial facts usually, and almost necessarily, depend upon their connection with each other." And in *Hendrickson v. People,* 10 N.Y. 13, 31, it is said that "considerable latitude is allowed on the question of motive. Just in proportion to the depravity of the mind would a motive be trifling and insignificant which might prompt the commission of a great crime. We can never say the motive was adequate to the offense; for human minds would differ in their ideas of adequacy, according to their own estimate of the enormity of crime, and a virtuous mind would find no motive sufficient to justify the felonious taking of human life." See also *Shailer v. Bumstead,* 99 Mass. 112, 130; *Commonwealth v. Coe,* 115 Mass. 481, 504; *Commonwealth v. Pomeroy,* 117 Mass. 143; *Murphy v. People,* 63 N.Y. 590, 594; *Kennedy v. People,* 39 N.Y. 245; *People v. Harris,* 136 N.Y. 423, 33 N.E. 65; *Commonwealth v. Abbott,* 130 Mass. 472. [Quoted also in 2 Wigmore on Evidence, *supra* at 329].

\* \* \* \* \* \*

The fact that the testimony also had a tendency to show that defendant had been guilty of Camp's murder [not the indicted offense] would not be sufficient to exclude it, if it were otherwise competent. 1 Greenl.Ev. § 3; *Farris v. People,* 129 Ill. 521, 21 N.E. 821; *People v. Harris,* 136 N.Y. 423, 33 N.E. 65.

150 U.S. at 60–61, 14 S.Ct. at 28.

Our decisions in this circuit are consistent with this reasoning. In the Watergate cases we held that evidence of other crimes

(the break in of Dr. Fielding's office) that is otherwise admissible may be offered if probative of motive. *United States v. Haldeman,* 181 U.S.App.D.C. 254, 311–314 & n. 145, 559 F.2d 31, 88–91 & n. 145 (1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *see Drew v. United States,* 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964). There is no justification for applying a different rule here. We believe that both the existence and the nature of the relationship between Day and Williams could be probative of Day's possible motive.[27] The two were not strangers; by Day's own admission, they were engaged in a criminal partnership which had successfully stolen guns and a car. The circumstances surrounding that partnership, and *in particular the bounty that was its consequence,* which was in Day's *sole* possession, would be highly relevant in ascertaining the motivations of the defendant. The old adage "Thieves will out" when pecuniary motives would be furthered has some value as an indicator of human behavior, and the courts have recognized as much in admitting evidence of a prior criminal relationship of the parties as probative of motive. *See, e. g., United States v. Gano,* 560 F.2d 990, 993 (10th Cir. 1977) (evidence of prior unlawful relationship with victim and her mother); *United States v. Dansker,* 537 F.2d 40, 57–58 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977) (evidence of previous embezzlement probative of motive to bribe); *United States v. Bobbitt,* 146 U.S.App.D.C. 224, 228, 450 F.2d 685, 689 (1971) (evidence of earlier threat to shoot decedent with a shotgun and of the prior relationship (common law wife) between the parties "obviously material in determining what motive the

defendant might have had to shoot decedent"); *Wakaksan v. United States,* 367 F.2d 639, 645 (8th Cir. 1966) (prior conviction for assault and battery against the deceased "relevant to show motive" for commission of voluntary manslaughter).

Moreover, independent evidence of a disagreement is not necessary. Given the criminal relationship between the parties and their theft of the guns and the car the motive may be inferred from the killing itself. 1 *Wharton's Criminal Evidence* (Torcia) (13th ed. 1972) 326. "It matters not that the crime is out of proportion to the motive sought to be shown. The existence of motive involves a question of fact for the jury." *Id.* at 326.[28]

The United States Attorney might decide to restrict his proof to showing that Day merely possessed the car at the time of the incidents; or the defendant might stipulate to facts so that the Government would consider it was unnecessary to prove the theft of the car. However, the Government might decide to offer testimony of that fact as the best method of portraying a prior joint criminal relationship between Day and Williams was at the heart of the murder.

In this connection the rule is:
*[W]hen an evidentiary fact is offered for one purpose, and becomes admissible by satisfying all the rules applicable to it in that capacity, it is not inadmissible because it does not satisfy the rules applicable to it in some other capacity and because the jury might improperly consider it in the latter capacity.* This doctrine, though involving certain risks, is indispensable as a practical rule [cases and footnote omitted].

---

**27.** We of course distinguish between "motive," or the reason Day might have wanted to kill Williams, such as the alleged dispute over guns and coats, and "intent" to commit some crime other than robbery with the guns acquired as a result of the prior crime.

**28.** We note that a possibility exists that Day might plead self-defense or urge accident. The record, and the course of oral argument, both contain representations to that effect, although defendant is not bound to use those defenses at trial. However, should these defenses be

raised (or alibi claimed), we note that, under our decision in *United States v. Brown,* 160 U.S.App.D.C. 190, 490 F.2d 758 (1973), the quantum of relevance contained in the proffered evidence would increase. *See* 160 U.S. App.D.C. at 212, 490 F.2d at 780. It is the responsibility of the district court to reconsider the balance between probative value and prejudicial impact with respect to motive should the developments suggested by the record and oral argument occur.

1 Wigmore on Evidence § 13 at 300 (3d ed. 1940) (emphasis in original). In such cases the risk of misusing the evidence is met by use of a limiting instruction.

In *United States v. Bridgeman,* 173 U.S. App.D.C. 150, 168, 523 F.2d 1099, 1117 (1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1743, 48 L.Ed.2d 206 (1976), we referred to another rule that is applicable here:

■■■ The rule fairly stated by Wigmore is:

> [I]f certain evidential material, having a legitimate probative value, tends nevertheless to produce also, over and above its legitimate effect, an *unfair* prejudice to the opponent . . . there is good ground for excluding such evidence, *unless it is indispensable for its legitimate purpose.*
>
> 6 *J. Wigmore, Evidence* § 1865 (1940) (emphasis added). *See also Scales v. United States,* 367 U.S. 203, 255–56, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); *Chandler v. United States,* 378 F.2d 906, 908 (9th Cir. 1967).

Our decisions in *United States v. Lee,* 166 U.S.App.D.C. 67, 73, 509 F.2d 400, 406 (1974), *cert. denied,* 420 U.S. 1006, 95 S.Ct. 1451, 43 L.Ed.2d 765 (1975) and *United States v. Fench,* 152 U.S.App.D.C. 325, 331, 470 F.2d 1234, 1240 (1972) discuss the same point. There is nothing in the new Federal Rules of Evidence that would cause us to alter this reasoning. The district court's ruling excluding the evidence on relevancy grounds is therefore both premature and overbroad to the extent it is inconsistent with our discussion above.[29] From the present record it appears that such evidence is indispensable to prove identity, motive, plan, intent and the relationship that existed between the parties. The prior crimes

evidence may thus be admitted, with a limiting instruction, to prove the relationship that existed between the parties. *United States v. Dansker,* 537 F.2d 40, 57 (3d Cir. 1976).

■■ Next, however, we recognize that even if evidence is properly admissible under Rule 404(b), the evidence must not otherwise be inadmissible under Rule 403, which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of *unfair* prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. [Emphasis added.]

This recognizes that testimony directly connecting an accused with a prior crime may be prejudicial on the issue of guilt but that it is only *unfair* prejudice that triggers the balancing requirement. Judge Robinson in *James* spoke somewhat to this point as follows:

> Only one other condition is imposed on the proponent of [Rule 404(b)] evidence: "its probative virtues must outweigh its prejudicial proclivities" in order to satisfy the strictures of Rule 403. To determine the admissibility of [the evidence in this case], then, we must ascertain first the use to which it might logically have been put and next the balance that possibly could be struck between its probative value in that role and its inflammatory impact.
>
> 181 U.S.App.D.C. at 62, 555 F.2d at 999.

■■ Realizing that the other crimes evidence would be highly probative (assuming the proper foundation is laid by the

---

**29.** It is true as the dissent states in note 22 that "inadmissible evidence is not rendered admissible simply because the Government otherwise would have difficulty proving its case." It is also true that otherwise competent, uncontradicted, relevant evidence is not rendered inadmissible because it is strongly probative on the essential elements of the identity and intent of the accused and where coupled with other evidence may be strong circumstantial proof of such elements of the crime. As the dissent acknowledges in note 11, the necessity of the evidence to prove the Government's case is a factor to be used in weighing its admissibility under balancing tests; yet it subsequently overlooks this principle. In so weighing the evidence, the court should be mindful of the heavy burden the Government bears to prove its case beyond a reasonable doubt and should not unduly restrict the Government in the proof of its case.

Government for its admission) on the question of motive, identity, plan and intent, the evidence can be excluded only if its prejudicial impact *unfairly* outweighs its probative value. On the written record before us, it is difficult to perceive what such unfair prejudice might be. There is no surprise in the evidence. It is not being newly thrust upon defendant Day. He was fully informed of the nature of the evidence in the first trial, and *he has pled guilty to the charges which the evidence supports.* The fact that such evidence may now be used to prove a link in the more serious crime of murder which overshadows the original crime, does not create any *unfair* prejudice to Day since the inference that is being drawn merely reflects the normal probative effect of the evidence. It cannot be claimed that any possible unreliability of the evidence might operate unfairly to prejudice Day, since Day has admitted the charges supported by this evidence. That some evidence may be strongly probative of guilt of a serious crime does not make its introduction *unfair.* In determining whether "the probative value is *substantially* outweighed by the danger of *unfair* prejudice" it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged. *McCormick on Evidence* (2d ed. 1972) p. 453 n. 55. That close relationship exists here. The evidence that Day committed the other crime is uncommonly reliable and it represents no surprise whatsoever to the defendant. Upon such facts, as presented by the record before us, it was an abuse of discretion to rule that such evidence was inadmissible. That error may be corrected on this appeal. *See McCormick on Evidence* (2d ed. 1972) p. 454. In so ruling we are in all respects just as

able as the trial court to judge the potential impact of the evidence because from the manner in which these issues were presented *on motion* no questions of credibility of testimony are involved.

■ Yet any time evidence of other crimes is deemed relevant to a material issue in the case because it tends to show motive, identity or some other element listed in Rule 404(b), there is a possibility that the jury might tend to conclude that the defendant is more likely to have committed the crime in question solely because he was involved in past crimes. Rule 404(b) is unambiguous that evidence cannot be admitted *only* to show such a proclivity. When such evidence is admitted for a proper purpose a proper limiting instruction should be given to caution the jury against drawing this impermissible inference.

■ The responsibility to decide *preliminary* questions of fact which are determinative of the admissibility of evidence challenged under evidentiary rules rests with the trial court.[30] If, at trial, other considerations not apparent from the present record demonstrate the existence of some *unfair* prejudicial effect not otherwise evident on the record, the district court is free to take those considerations into account and declare, through a proper application of the applicable standards, the evidence inadmissible under Rule 403. Thus, if the circumstances of the trial change, the district court is free to do its own balancing in light of new or altered circumstances. Thereafter, the abuse-of-discretion standard governs appellate review. Judge Weinstein suggests that "[t]he usual approach on the question of admissibility on appeal is to view both probative force and prejudice

---

30. *United States v. Nixon,* 418 U.S. 683, 701 n. 14, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974) ("As a preliminary matter, there must be substantial, independent evidence of the conspiracy, at least enough to take the question to the jury. . . . Whether the standard has been satisfied is a question of admissibility of evidence to be decided by the trial judge."); *United States v. Glazer,* 532 F.2d 224, 228 (2d Cir.), *cert. denied,* 429 U.S. 844, 97 S.Ct. 123, 50 L.Ed.2d 115 (1976); *United States v. Dowdy,* 479 F.2d 213, 226 (4th Cir.), *cert. denied,* 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973); *United States v. Knight,* 416 F.2d 1181, 1186 (9th Cir. 1969); *Bradford v. United States,* 413 F.2d 467, 472 (5th Cir. 1969); *United States v. Pasha,* 332 F.2d 193, 198 (7th Cir.), *cert. denied,* 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45 (1964); *Carbo v. United States,* 314 F.2d 718, 737 (9th Cir. 1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964).

most favorably towards the proponent, that is to say, to give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." J. Weinstein & M. Berger, *Evidence* ¶ 403[03] at 403–18 (1977). As Judge Weinstein notes, this is consistent with the "thrust of the Federal Rules" which favors "admissibility." *Id.* And the Supreme Court has recently reminded us:

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence.

*United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). And as *McCormick on Evidence* (2d ed. 1972) states:

> A decision clearly wrong on this question of balancing probative value against danger of prejudice will be corrected on appeal as an abuse of discretion.

*Id.* § 190 at 454 (footnote omitted).

 We therefore reverse the district court's conclusion that the evidence of other crimes is inadmissible with respect to Day for lack of relevancy, and hold that the evidence is admissible to the extent above set forth, provided the Government lays a proper foundation for its admission and the evidence is not proved to be otherwise inadmissible under Rule 403.[31]

### D. Severance

 Since we affirm the district court with respect to defendant-Sheffey but reverse the district court with respect to defendant Day, Sheffey is entitled to a severance upon the resumption of the proceedings in the district court. Unless the district court finds that the evidence with respect to Day is inadmissible under Rule 403, it is expected that the district court will order a severance.

## II

### THE MASON TESTIMONY

The second issue is whether the court also erred in ruling that evidence of certain statements of the decedent Williams made prior to his death were inadmissible as part of the Government's proof.

### A. The Government's Proof & the District Court's Rulings

It is the Government's theory that shortly after 11:00 p. m. on December 16, 1976, Williams came by Mason's home in southeast Washington, D.C., and told Mason that he had just had a fight with his best friend, that he had asked Day why he was "shooting dope," and that Day had hit him for asking. Williams also told Mason, according to the Government, that Day and "his boy" were trying to "get out on him" over guns and some leather coats. A few minutes later, Williams and Mason went outside and got into Williams' car. At that time, Williams showed Mason a sawed-off shotgun and told Mason that he, Day, and a friend of Day's named Eric (Sheffey's first name is Eric) had robbed a sporting goods

---

**31.** While the evidence of other crimes of which Sheffey was acquitted (counts 2 through 8) is not admissible in Sheffey's second trial, because collateral estoppel bars the use of that evidence with respect to Sheffey, the evidence purporting to link Sheffey with such other crimes would be admissible in the trial against Day. The collateral estoppel doctrine applies to subsequent proceedings between *the same parties,* and that requirement is not met with respect to the evidence against Sheffey in the trial of Day.

The record is insufficient to permit us to determine whether this may have any relevancy, but if any evidence exists that Sheffey participated in the theft of the Buick on December 14, 1976 in Maryland, or in its transportation from Maryland to the District of Columbia on such date, such evidence is admissible because Sheffey was never charged or tried on any such offense which allegedly occurred on December 14, 1976. He was charged and acquitted of using and operating Plater's Buick without his consent on December 15, 1976 within the District of Columbia.

store earlier that week and had obtained seven or eight guns. While driving in the car, Williams told Mason that the guns were at Day's girl friend's house. He gave Mason a slip of paper on which he had written "Beanny, Eric, 635–3135," and told him that if he (Williams) was not back home by 3:00 the next day to call the police, tell them what he had told Mason, and give them the number.

At about 11:30 p.m., Williams and Mason arrived at the former's home at 870 Southern Avenue, S.E., and Williams complained that his leg was hurting. Shortly after midnight, Mason and Williams left the house and walked toward Williams' car which was parked in an adjacent parking lot. As they were about to get in the car, the horn from a car parked across the parking lot sounded and Williams said, "there goes Beanny now." [32] Day's nickname was "Beanny." Williams then walked across the parking lot to the car, which he had indicated contained "Beanny"; Mason remained by Williams' car. As Williams leaned toward the car occupied by "Beanny," he was shot in the face with a sawed-off shotgun held by an occupant in the car; he died instantly.

On appeal, the Government challenges the district court's ruling insofar as it applied to three items relative to this series of events, all of which were excluded by the court:

(1) The fact that decedent gave Mason a slip of paper upon which he had written "Beanny, Eric, 635–3135" and told Mason "if he [Williams] wasn't back home by three the next day to call the police and tell them what he had told me and give them the number."

(2) Decedent's statement to Mason that decedent and "Beanny" (i. e., Day) had a fight over guns and coats and that Bean-

ny and "his boy" were trying to "get out on him" over the guns and leather coats.

(3) Decedent's statement to Mason that "his leg was hurting."

■ We note at the outset that the district court expressed concern on the question of whether Mason was a credible witness. The court stated:

I have listened to this witness on the stand with respect to it,[33] and it is clear that he gives different versions. Now I . . . know that these witnesses get rather confused and I am not worried about some of the confusion or some of the uncertainty that he expresses as to when he gave it allegedly to Mr. Adelman [Government counsel]. But I am disturbed as to others.

There is a serious question as to whether or not he has a true recollection of the incident. We have a statement given by him on December 17, within hours of the incident. We have another statement given by him one month later, January the 17th, and they are not consistent versions.

Tr., Nov. 7, 1977, at 121–22. It is simply not clear on the record how much weight the court gave this concern when it decided to exclude four of the five statements that Mason would offer at trial. However, the court plainly did not find that this witness was *incompetent* to testify. Rather, the court appears simply to have been giving its own views on the credibility of the witness. The opinions which the trial court holds as to credibility do not constitute valid reasons for withholding otherwise admissible evidence. While the competency of a witness to testify before a jury is a threshold question of law committed to the trial court's discretion, and which will not be set aside

**32.** The district court ruled that this statement —"there goes Beanny now"—is admissible and this ruling is not challenged on appeal. Tr., Nov. 7, 1977, at 123. The transcript refers to both "Beanny" and "Beannie." The slip of paper had "Beanny" written on it.

**33.** The referent for "it" in the trial judge's discourse is somewhat unclear. "It" might refer

simply to Mason's testimony that Williams said "Beanny was out to get him," or "it" might refer to Mason's testimony in a more general sense. *See* Tr., Nov., 1977, at 120–22. In any event, our analysis of the district court's concern about Mason's credibility makes it unnecessary to resolve specifically to what "it" refers.

unless clear error appears,[34] it remains for the jury to assess the credibility of the witness and the weight to be given his testimony.[35] We are satisfied that the district court did not exclude this evidence *because* it thought the witness lacked credibility. Rather, the court was principally concerned with hearsay problems and questions of relevancy and prejudice, and it is on those issues that the proper resolution of this phase of the case depends.

On November 7, 1977, the district court ruled that it would not permit Mason's testimony to be admitted. With particular reference to Williams' statement about the dispute and fight he supposedly had with Day, the district court stated that "it leaves a great deal to be desired, the Government putting forth this statement as showing the deceased's state of mind." [36] The court also referred to some apparent confusion and ambiguity in Mason's proffered testimony. It stated: "There is a serious question as to whether or not he has a true recollection of the incident." [37] The court said "Beanny's boy" could mean anyone. And I am not satisfied with it. To allow such before a jury would be prejudicial." [38] With respect to Williams' statement about the pain in his leg, the court expressed concern for the many inferences that might be drawn from the statement: "There are ever so many reasons why his leg might be hurting." [39] The district court concluded:

> The only thing that I can . . . allow[ ] you [the Government] to introduce[ ] is the statement of the deceased Williams immediately before he walked over to the car to Mr. Mason, "There goes Beanny now." . . . I will allow that and deny everything else.
> . . . Judge MacKinnon raises a num-

ber of red flags [in *United States v. Brown*, [160 U.S.App.D.C. 190] 490 F.2d 758 (D.C.Cir.1973)], and to be sure, that opinion was written before the rules were adopted, but the principles announced, that are discussed in Judge MacKinnon's opinion are no different from the principles that we observed as of November 7, 1977.

Tr., Nov. 7, 1977, at 123–24.

B. *Williams' Statement Accompanying Delivery of the Slip of Paper*

We turn first to the Government's contention in their brief and at oral argument that the following testimony should be admitted: the fact that Williams gave Mason a slip of paper, the writing on that paper, and the contemporaneous statement that if he (Williams) was not home by 3:00 o'clock the next day, Mason should call the police, tell them what he had said, and give them the number.

The Government, in arguing this point, does not seek to have admitted the content of "what he (Williams) had said," concerning the statements made prior to giving Mason the slip of paper about the fight and the dispute between him and Day, the robbery, and the location of the guns.

In arguing that the statement which immediately accompanied the delivery of the slip of paper is not hearsay, the Government states: "All that is sought to be proven in connection with the statement now under consideration, is that it was *in fact* made." Govt.Br. at 31 (emphasis in original). But in actuality, the Government seeks to have something more inferred from the content of the statement. The jury is being asked to infer from Williams' words that Day bore ill will toward Williams and

**34.** *United States v. Heinlein*, 160 U.S.App.D.C. 157, 162, 490 F.2d 725, 730 (1973); *United States v. Crosby*, 149 U.S.App.D.C. 306, 207, 462 F.2d 1201, 1202 (1972); *United States v. Hardin*, 143 U.S.App.D.C. 320, 322, 443 F.2d 735, 737 (1970).

**35.** *United States v. Benn*, 155 U.S.App.D.C. 180, 183, 476 F.2d 1127, 1130 (1973); *United States v. Rosebar*, 150 U.S.App.D.C. 164, 166, 463 F.2d 1255, 1257 (1972); *Johnson v. United States*, 138 U.S.App.D.C. 174, 178, 426 F.2d 651, 655 (1970), *cert. denied*, 401 U.S. 846, 91 S.Ct. 1258, 28 L.Ed.2d 523 (1971).

**36.** Tr., Nov. 7, 1977, at 121.

**37.** *Id.*

**38.** *Id.* at 122.

**39.** *Id.* at 123.

had *reason to cause him harm.* Because this inference attaches to Williams' statement, the Government is seeking to use the statement for more than the mere fact that it was made.

The Government also contends that this statement is admissible as an utterance contemporaneous with a non-verbal act which relates to and elucidates that event, *i. e.,* the giving of the piece of paper. Govt.Br. at 31 n. 41. Professor Wigmore has described the limitations which attended the use of utterances forming the verbal part of an act. The first limitation is:

> [T]he conduct that is to be made definite must be independently material and provable under the issues, either as a fact directly in issue or as incidentally or evidentially relevant to the issue. The use of the words is wholly subsidiary and appurtenant to the use of the conduct. The former without the latter have no place in the case, and could only serve as a hearsay assertion in direct violation of the rule . . . .

VI Wigmore on Evidence, § 1773, at 268 (Chadbourn rev. 1976). In this case, the conduct to be made definite is that Williams gave Mason a slip of paper. Had Williams said "take this slip," that utterance would have been "wholly subsidiary and appurtenant" to the conduct. Here, Williams said more, and the inference from those words is not wholly incidental to the conduct. We conclude that the statement accompanying the delivery of the paper is inadmissible hearsay.

Our analysis does not end here, as Rule 803(3) provides an exception for evidence of state of mind. That rule provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * * * * *

(3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing *state of mind,* emotion, sensation, or physical condition (such as intent, plan, motive, design, *mental feeling,* pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will. [Emphasis added.]

We briefly summarized the purpose of the exception in *United States v. Brown,* 160 U.S.App.D.C. 190, 490 F.2d 758 (1970):

> [T]he state of mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the declarant at that time *if that is the issue in the case.* . . . It also allows such statements to show a future intent of the declarant to perform an act if the occurrence of that act is at issue.

160 U.S.App.D.C. at 194, 490 F.2d at 762 (emphasis added). We noted that such statements invariably contain some extraneous factual elements which necessitate limiting instructions to ensure that the statements are considered solely on the issue of the declarant's mental state and not *for the truth of the matters contained therein.* 160 U.S.App.D.C. at 195, 490 F.2d at 763. We also noted that whether such evidence is admissible is subject to the rule of extrinsic policy, which is now embodied in Rule 403:

> [S]ome evidence, while bearing some *logical* relevance to the case, may in the discretion of the judge nevertheless be excluded where its probative value is substantially outweighed by the danger of *unfair* prejudice, confusion or delay.

*Id.* (emphasis in original except "unfair").[40] While Williams' statements to Mason are

---

**40.** We elaborated upon these dangers later in the opinion:

> Quite a number of courts have confronted facts similar to those here involving hearsay statements made by the victim of a homicide which inferentially implicate the defendant. Such statements by the victims often include previous threats made by the defendant to-

wards the victim, narrations of past incidents of violence on the part of the defendant or general verbalizations of fear of the defendant. While such statements are admittedly of some value in presenting to the jury a complete picture of all the facts and circumstances surrounding the homicide, it is generally agreed that their admissibility must be

some indication of his state of mind, *i. e.,* to fear of the future, there is a danger that the jury would misuse such evidence. We described the nature of the balancing process at length in *Brown,*[41] *supra,* and we need not restate that discussion here.

We think that the inference to be drawn from Williams' statement to Mason which accompanied his handing over of the slip of paper, involving as it did somewhat of a prophecy of what might happen to him, has too great a potential for *unfair* prejudice, and we do not think that a limiting instruction can correct that deficiency. As was the case in *Brown,* the prejudicial dangers in the statement in question are substantial. Had Williams referred to prior harmful acts or threats by Day, such statements would be even more unfairly prejudicial, but even here "a palpable danger exists" that the jury will infer from the statement, "if anything happens to me, call the police and give them the names on this slip [*i. e.,* Day and Sheffey]," that Day and Sheffey were capable of murder, or that they had done things in the past to justify Williams' apprehension. Such inferences insofar as they reflect on defendants' intentions or past conduct would be improperly drawn. *See* 160 U.S.App.D.C. at 210, 490 F.2d at 778. In fact, on the present record, Williams' state of mind, from which such inferences would be drawn, is immaterial. Of course, the situation will be different if the defendant seeks to adduce evidence tending to show self-defense or accident. Under the present circumstances of this case, we find the proffered evidence in this regard to be inadmissible at the outset of the Government's case in chief, and we

would doubt the efficacy of a limiting instruction.

Even though we affirm the district court's ruling that the statement accompanying the delivery of the slip cannot be admitted, the slip of paper itself is admissible and Mason can testify that sometime in the hour before the shooting Williams gave him the slip of paper, that he telephoned the police after witnessing the shooting, and that he gave the police the information on the slip.

No hearsay problem is presented by the slip of paper and the writing on it ("Beanny, Eric, 635–3135"). Written assertions are not immune from the hearsay rule, Fed.R.Evid. 801(a)(1). However, the information on the slip was not hearsay. The words themselves do not assert anything except that Beanny and/or Eric might have a particular telephone number. The statement is not being offered as proof that Beanny and/or Eric had that telephone number, and hence, we conclude that the statement is not within the definition of hearsay evidence, Fed.R.Evid. 801(c).

The dissent contends that if the information on the slip means no more than that two individuals might have a particular telephone number, there can be no justification for allowing the slip to be admitted into evidence. Dissent at 894. We disagree, as we believe the slip nevertheless has relevance to the issues in the case. The slip itself, when coupled with the fact that Williams wrote it, tends to show a current *association* between Williams and individuals named "Beanny" and "Eric."[42] When statements by an out-of-court declarant

---

determined by a careful balancing of their probative value against their prejudicial effect. Courts have recognized that such statements are fraught with inherent dangers and require the imposition of rigid limitations. 160 U.S.App.D.C. at 197–98, 490 F.2d at 765–66.

**41.** 160 U.S.App.D.C. at 196–99, 490 F.2d at 764–67.

**42.** · It is this fact, among others, which distinguishes this case from *United States v. Barash,* 365 F.2d 395 (2d Cir. 1966), *after remand,* 412 F.2d 26 (2d Cir.), *cert. denied,* 396 U.S. 832, 90

S.Ct. 86, 24 L.Ed.2d 82 (1969), cited by the dissent in note 47. In *Barash,* defendant had been convicted of various counts relating to improper payments to internal revenue agents in connection with their office audit examinations of income tax returns of certain of defendant's (an attorney and CPA) clients. An agent testifying for the Government was permitted to state at trial that he had expected a payoff because defendant had been introduced to him by a fellow employee who "never introduced me to anyone except someone who was going to pay me off." 365 F.2d at 399. The court said this testimony was hearsay, as the

which are neutral (not assertive of direct complicity in crime) [43] are offered to show association and not to show the truth of the matters contained therein, and the evidence is not otherwise unfairly prejudicial, the weight of the decided cases allows admission. For example, in *United States v. Ruiz*, 477 F.2d 918 (2d Cir.), *cert. denied*, 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973), appellant had been convicted of conspiracy to distribute heroin. On appeal, he argued that a slip of paper bearing his nickname and a telephone number, seized from the person of an alleged coconspirator after that individual's arrest, was inadmissible hearsay and was therefore not relevant on the threshold question of conspiracy. The court disagreed, holding:

> The paper was not introduced to prove the truth or falsity of its contents. It was merely evidence supporting the in-

ference that Torres [the alleged coconspirator] knew Ruiz and anticipated calling him on the telephone.

477 F.2d at 919.

■ In *Brown v. United States*, 403 F.2d 489 (5th Cir. 1968), *cert. denied*, 397 U.S. 927, 90 S.Ct. 932, 25 L.Ed.2d 106 (1970), appellant had been convicted of numerous drug charges along with three other persons. On appeal, he argued that a slip of paper found on appellant bearing the handwritten information "Ramon" and a telephone number was inadmissible hearsay. The court disagreed, stating that the writing on the note was not hearsay, as it was offered to show knowledge by appellant of one "Ramon" who may or may not have been an associate of the alleged supplier of the drugs. 403 F.2d at 491.[44] These cases as well as the instant case are to be distinguished from those such as *United States v.*

---

fellow employee was asserting in effect that Barash was an accountant of the paying kind. *Id.* The court recognized that evidence admissible for one purpose is not rendered wholly inadmissible simply because it fails to satisfy the rules in its other use; under such circumstances, the opponent of the evidence is entitled only to a limiting instruction on timely request. 365 F.2d at 400. But in that case, the court could not find another purpose: the evidence was relevant because its only purpose was to show the agents state of mind, and state of mind was irrelevant unless induced by the fellow employee, a fact as to which the employee's statement was hearsay. *Id.* Even if the statements and acts in the present case were hearsay, the existence of the other purpose would distinguish our facts from *Barash*.

**43.** In describing this information as "neutral," we distinguish the information on the slip from other types of statements. For example, if the slip contained in writing the statements made orally by Williams when he delivered the slip, we would not characterize the information as "neutral." Similarly, if the writing on the slip contained a statement to the effect that "I am afraid I will be killed by [Eric and Beanny]," *see United States v. Brown*, 160 U.S.App.D.C. 190, 210, 490 F.2d 758, 778 (1973), we would not characterize the information as neutral.

**44.** There are many other reported cases which draw these analytical distinctions in related contexts. In *United States v. Ellis*, 461 F.2d 962 (2d Cir.), *cert. denied*, 409 U.S. 866, 93 S.Ct. 162, 34 L.Ed.2d 115 (1972), appellant had been convicted of three counts of violating the federal bank robbery statute. On appeal, he

raised several challenges, including that the trial court received inadmissible hearsay into evidence. Appellant argued that address books belonging to his codefendants and which contained his name and a driver's license in the name of one codefendant found in one of the address books were hearsay. The court held that the address books were not hearsay and were "admissible as circumstantial evidence showing association." 461 F.2d at 970. Also, the court found the driver's license not to be hearsay, since it was not "offered for the truth of the matter asserted therein, but rather as circumstantial evidence to show that [the codefendant] was the owner of the address book and the coat in which the book and the license were found." *Id.*

In *United States v. Canieso*, 470 F.2d 1224 (2d Cir. 1972), defendants had been convicted of conspiring to import heroin and of possessing it with intent to distribute. Chou, one defendant, claimed that a letter taken from Canieso's person, the codefendant, was erroneously admitted against him under the hearsay rule. Two letters were found in Chou's pockets. The letter found in Canieso's wallet to which Chou objected dovetailed into the two letters found in Chou's pockets. The court stated:

> The only way in which the letter can be deemed hearsay is by inserting in it a statement that the writer had entrusted Chou with the task of making the needed contacts in New York. We see no particular reason for doing this simply to create a hearsay problem that would not otherwise exist—even though the jury would doubtless draw exactly this inference. Here the resemblance of the letter found in Canieso's wallet to the one found on

*Watkins,* 171 U.S.App.D.C. 158, 519 F.2d 294 (1975), where the proffered written statements are being used to prove the truth of the matters contained therein.[45] In short, we conclude that the "Beanny, Eric" slip itself is not inadmissible hearsay and is not inadmissible for lack of relevancy. Likewise it is not inadmissible because of the availability of some oral testimony to prove some association of the parties named on the slip and the victim. The slip of paper is stronger evidence of association and it indicates that such association was continuing almost up to the moment of the murder. There is no reason to deny the Government such proof. Together with other evidence it tends to prove that defendants were not killing a stranger.

 No hearsay problem is presented by Mason's testimony that he received the slip from Williams. In so testifying, Mason is simply a witness to an act performed by another in his presence. While we must be sensitive to the possible communicative content of the act of handing over the slip of paper, we believe that the act of handing

Chou's person affords a considerably stronger basis for a conclusion that the Canieso letter was receivable "*circumstantially,* as giving rise to indirect inferences, but not as assertions to prove the matter asserted," 6 Wigmore, Evidence § 1766, at 180 (3d ed. 1940) . . . .
470 F.2d at 1232. Without expressing approval or disapproval for the results in the particular cases above, we follow the reasoning in these cases by not inserting content into the presently neutral information on the slip, which is to be viewed apart from the prejudicial statement made upon delivery that we excise from the evidence to be given to the jury.
*See United States v. Snow,* 517 F.2d 441, 443–44 (9th Cir. 1975) (name tape which was affixed to case in which gun was found and which bore defendant's name was not hearsay and was properly admitted to show that defendant knowingly possessed the unregistered weapon; name tape treated as circumstantial evidence and deemed relevant); *Hiram v. United States,* 354 F.2d 4, 7 (9th Cir. 1965) (newspaper article describing bank robbery and naming certain person as robber was not inadmissible as hearsay in prosecution on charge of being accessory after the fact to bank robbery, where article was not offered for truth of matter stated therein but only to show notice to defendant of the robbery and of named person's alleged participation therein); *United States v. Mishkin,* 317 F.2d 634, 637 (2d Cir.), *cert. denied,*

this slip of paper to Mason—when the accompanying oral statement made by Williams is excised from the proffered testimony—is virtually neutral (not assertive of direct complicity in crime). But the act of delivery is not without relevance, for it tends to show association between the decedent and the individual's whose names appear on the slip. It is a relevant circumstance from which reasonable inferences can be drawn. If Mason is asked whether a statement accompanied the handing over of the slip, he may not testify as to the content of the statement but he may answer the question by indicating in the affirmative or negative whether a statement was made, *unless* the district court rules, on grounds not apparent in the present record, that such an answer would be unfairly prejudicial. Normally, an answer to such a question is admissible. The mere fact that a statement was made is not the same as offering the statement for the truth of the matter contained therein. *See* VI Wigmore on Evidence § 1766, at 250 (Chadbourn rev. 1976).

375 U.S. 827, 84 S.Ct. 71, 11 L.Ed.2d 60 (1963) (slips of paper, which had unpublished telephone number of defendant and his first name on them, and which were found in wallet of alleged coconspirator when he attempted to pick up obscene books from subway locker, were not inadmissible hearsay, since slips were admitted not to prove defendant's telephone number and connection with the bookstore, but as part of proof that codefendant had received the key to subway locker from defendant).

**45.** In *Watkins,* appellant was charged with various drug violations. A search of a room in which appellant and others were present at the time turned up drugs, drug-related paraphernalia, large amounts of cash, and three receipts indicating that appellant had paid the rent on the apartment for two months and had paid for utility service in another month. 171 U.S.App. D.C. at 159–60, 519 F.2d at 295–96. Against the Government's contention that the documents were tendered not for the truth of their contents but rather to show they were found in the bedroom occupied by appellant on the day in question, the court noted the rule that "receipts are hearsay as independent evidence of the making of payment" and found the receipts inadmissible, as "a principal, if not the primary, purpose of the introduction . . . was . . . to show 'who was living there.' " 171 U.S.App. D.C. at 160–161, 519 F.2d at 296–97.

 No hearsay problem is presented by Mason's testimony that after he witnessed the shooting, he called the police and gave them the information on the slip. In so testifying, Mason is simply relating his own conduct after the murder. Such testimony is not unfairly prejudicial: while Mason's actions were carrying out Williams' instructions, calling the police would have been normal conduct if Williams had made no statements to him. Mason's testimony is not irrelevant, for it shows why the defendants were immediately suspects in the murder and why a search for them was undertaken immediately with such incriminating results.

We do not believe that the evidence we are admitting encourages unfairly prejudicial inferences by the jury. The reason Williams' statement accompanying the handing over of the slip is excluded is that it is hearsay. The hearsay danger posed is that the jury might conclude from the statement that Day bore ill will toward Williams and had reason to cause him harm. The jury might infer from the slip, apart from the statement, that Williams was *associated* with defendants. That is a permissible inference since there is nothing in the slip of the paper itself that would lead the jury to conclude that defendants had a reason to kill Williams.[46] It is only from the

connection with other admissible evidence that such conclusion might emerge. The evidence that we rule may be admitted is circumstantial, non-hearsay evidence, and we perceive no unfair prejudice in its admission.[47] Given the relevance of the evidence and the fact that it is not unfairly prejudicial, the mere fact that the Government might have other witnesses who could testify that Williams was associated with Day and Sheffey before the murder does not provide a reason to exclude the testimony that we hold to be properly admissible. No other witness can testify—directly or indirectly—to the *immediacy* of the association of Williams with "Beanny & Eric" that flows from the writing on the paper and its delivery at the time it was delivered. The prosecution is entitled to such probative evidence—not because it is innocuous as the dissent characterizes our position—but because there is strong proof of its veracity and it is not *unfairly* prejudicial. And it is probative of the association and relationship of the parties. Thus, the potential for jury misuse does not exist as an *independent* factor and the writing is admissible. Fed. R.Evid. 403.

### C. *Williams' Statements As to a Dispute with Day*

 The Government also seeks to have admitted other statements made by Wil-

---

**46.** See 4 J. Weinstein and M. Berger, Evidence ¶ 801(c)[01], at 801–63 (1977):
> Rather than focusing on the technical question of whether a given statement is beyond the hearsay rule's scope or whether it qualifies as [an] exception, it would be more fruitful to concentrate on the hearsay danger posed.

**47.** The dissent suggests with respect to the testimony relating to the slip of paper bearing the names and telephone numbers that because the hearsay rule requires the exclusion of some of the attendant statements that the paper should thereby be excluded entirely (dissent at 893). However, if that were to be the outcome, the rule itself would provide for the complete exclusion of such evidence, but it does not so provide—only the accompanying hearsay statements must be excluded. The exhibit may still be introduced and its circumstantial effect argued to the jury. The timing of the delivery of the paper, and the fact that it bore the names of Day and Sheffey and their telephone numbers, circumstantially linked them to the

victim at the critical time. The jury was entitled to weigh these circumstances along with the rest of the evidence. The dissent contends that such evidence is valueless, but it is not. It was one of the material pieces of evidence that led the police to the bloody gun, bloody pants, and keys to the bloody car, containing the discharged shotgun shell, parked around the corner from Day's house. All bore blood of the victim's type. Because the slip's relevance and probative effect must be restricted by excluding the accompanying statement does not mean that the paper must be entirely excluded. The dissent's argument for the exclusion of the evidence would coin a new exclusionary rule. The delivery of the paper by Williams tends to prove his contemporaneous association with Day and Sheffey and the bloody exhibits (which the paper assisted in producing) tend to prove Day and Sheffey's contemporaneous association with Williams. These are strong circumstances that justice requires be laid before the jury for their evaluation.

liams during the period preceding his death. These statements are to the effect that Williams had previously fought with Day, and that the two were in a dispute about guns and coats. The Government seeks to have this evidence admitted under the state of mind exception contained in Rule 803(3). In the Government's view, this evidence is probative that Williams was in a state of fear. We have noted above the dual aspect of such evidence. While it may tend to show fear on the part of the decedent, it also carries the plain inference that Day had the state of mind and a reason to murder decedent. This inference is not a logical conclusion from evidence offered to show the victim's state of mind, and hence, because of its potential to create unfair prejudice, the district court acted properly in ruling that it was inadmissible. For the same reasons we discussed earlier with respect to the oral statement which accompanied Williams' handing over the slip to Mason, we believe that a limiting instruction would not adequately protect the defendant from the unfairly prejudicial effect of the evidence. As was also true with the statements accompanying Williams' handing over of the slip to Mason, the Government's theory favoring admissibility is that the state of mind of Williams is material, but on the record before us that state of mind is not material. The situation will be different, of course, if the defendant raises self-defense or accident.

## D. Williams' Statement Concerning His Leg

■ The third and final statement in issue on appeal is decedent's statement to Mason that his leg was hurting. Rule 803(3) excepts from the hearsay rule statements of a present physical condition. For the exception to apply, there must be a spontaneous statement describing a contemporaneous physical condition.[48] These requirements were met here.

■ However, as the Government recognizes, such evidence is admissible only if it is relevant and fairly probative on a material issue in the case. The district court concluded that there were many reasons why the leg could be hurting, and that it would be impermissible for the Government to speculate that because Williams' leg hurt a fight had occurred with Day. While the injury would be probative on the intensity of the fight between Day and the decedent, it is first necessary for the evidence to demonstrate that the fight occurred. A proper foundation for the admission of Williams' statement must be shown to exist, and thus far, the Government has not pointed to evidence that will prove such foundation. If in the course of the proceedings a proper evidentiary foundation is laid, the district court, in the sound exercise of its discretion, should reconsider its prior ruling.[49]

## III

## CONCLUSION

The ruling of the district court excluding evidence of other crimes in the second trial of Sheffey is affirmed to the extent set forth in the opinion. The ruling excluding evidence of other crimes in the second trial of Day is reversed, subject to the conditions set forth in this opinion. The ruling of the

48. See generally 4 J. Weinstein & M. Berger, Evidence, ¶ 803(3)[01], at 803–91 (1977).

49. 18 U.S.C. § 3731 (1976) provides:
 * * * * * *
An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding of an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.
 * * * * * *
We have also considered appellees' argument that certification of this action was improper under 18 U.S.C. § 3731, and we find that argument to be without substance.

district court excluding the testimony of Kerry Mason is affirmed in part and reversed in part, as set forth in this opinion.

*Judgment accordingly.*

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting in part:

I concur fully in affirmance of the District Judge's exclusion of the other-crimes evidence implicating appellee Sheffey. I join also in today's rejection of most of Mason's expected testimony in relation to Williams' conduct and statements. I think, however, that my colleagues err in approving introduction of the remainder of that hearsay testimony.[1] I disagree, too, with recommittal to the District Judge of the question of the prior-crimes evidence pertaining to appellee Day, for I see no justification as yet for an undertaking to weigh prejudice in this case.[2] And even were my brethren correct in their view that the balancing stage of prior-crimes analysis must be reached, I am disquieted by their broad indications of how the District Judge should exercise its discretion on remand.[3] The District Judge is reversed in these respects on the narrowest of grounds—grounds that were never meaningfully presented to him or to us by the Government.

## I. OTHER CRIMES EVIDENCE AND DAY

My colleagues correctly note that evidence of a crime or bad conduct other than that for which the accused is on trial is admissible if probative on a material issue unless the possibility that the jury will draw the prejudicial conclusion "that, having once fallen into sin, a second slip is likely"[4] outweighs the legitimate value of the evidence.[5] Thus the first question to be answered is what is the material issue here that the proffered facts of prior criminality support, and that involves a look not just at the issue but at the evidence as well, first to see what it suggests and then to see how strongly it does so. Additionally, this examination must be advertent to the full context of the case, for evidence that is merely cumulative, that only weakly supports a material contention or that goes solely to uncontested issues will seldom survive a balance against the ever-present and often compelling risk of prejudice.[6] On the other hand, evidence essential to the Government's prima facie case or to rebuttal of defenses set up by the accused will often tilt the scale in favor of admission.[7]

As the court outlines more fully, the Government here contends in essence that evidence of two other crimes is relevant to two material issues in this prosecution. It is argued first that the Irving's robbery is probative of motive because, the Government believes, the homicide resulted from a dispute between Day and Williams partly over shotguns procured during the robbery.

1. See Part II *infra.*

2. See Part I *infra* at notes 6–21.

3. See Part I *infra* at notes 22–30.

4. *United States v. James*, 181 U.S.App.D.C. 55, 62, 555 F.2d 992, 999 (1977).

5. *United States v. Haldeman*, 181 U.S.App.D.C. 254, 311, 559 F.2d 31, 88 (1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), and cases cited in note 145; see Fed.R. Evid. 403.

6. See, *e. g., United States v. James, supra* note 4, 181 U.S.App.D.C. at 63 & n.46, 555 F.2d at 1000 & n.46 ("such an inference is so weak as to bring into serious question whether its contribution to the accuracy of the trial process outweighed the likelihood that its dramatic flavor would derange it"); *United States v. Good-win*, 492 F.2d 1141, 1152 (5th Cir. 1974) ("[a]lthough intent was an element of the crimes charged, that issue was never seriously disputed at trial" and thus there was a "total absence of need for the evidence"); *United States v. Coades*, 549 F.2d 1303, 1306 (9th Cir. 1977).

7. *United States v. Spletzer*, 535 F.2d 950, 956 (5th Cir. 1976); see *United States v. Jardan*, 552 F.2d 216, 219 (8th Cir.), *cert. denied*, 433 U.S. 912, 97 S.Ct. 2982, 53 L.Ed.2d 1097 (1977) ("the Government is entitled to anticipate the obvious defense of lack of intent," which was an element of the crime). See also *United States v. Adcock*, 558 F.2d 397, 402 (8th Cir.), *cert. denied*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977); *United States v. Maestas*, 554 F.2d 834, 836 n.2, 837 & n.3 (8th Cir. 1977).

Beyond that, proof of the Irving's robbery and the automobile theft is sought to be introduced to show identity, since the death weapon and the car allegedly used in the murder—and other shotguns whose barrels were shortened—were all allegedly obtained by Day as a result of the earlier offenses.

Both identity and intent are fundamental elements of the prosecution's prima facie case, but both the Government and the court fail to realize that that is not the end of the matter. Before turning to the prejudice counterpoise, one must first ascertain whether the fact of prior crime, *as opposed to a fact that is an ingredient of the crime but is neutral on its face*, is indicative of either identity or intent. If not—if the evidence can serve no purpose other than "to prove the character of a person in order to show that he acted in conformity therewith" [8]—then we do not reach the stage of balancing prejudice.[9] Only when the criminal nature of the earlier occurrences is itself probative on material issues,[10] or when evidence of facts that were parts of those occurrences cannot adequately be presented in a manner free of the taint of associated criminality,[11] can it be said that a showing of the prior *crimes* themselves seeks a permissible objective.

## A. Motive and Intent

On the question of motive to commit murder, the Government wants to show that Day and Williams had been arguing prior to the shooting. That, of course, could be done without mentioning any prior criminality,[12] so it is suggested further that the two were bickering over the shotguns. But that fact, for all we have yet been shown, could be established without any reference whatever to the robbery. Though it is contended that the jurors need to know how the shotguns were acquired, I must simply ask why, and I have yet to hear a palatable answer.

The disagreement between Day and Williams was allegedly over guns *and* some coats *and* whether Williams should have asked Day why he was using drugs. Yet the Government apparently has no desire to

---

**8.** Fed.R.Evid. 404(b).

**9.** See *United States v. Rice*, 550 F.2d 1364, 1372 (5th Cir.), *cert. denied*, 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977) (exclusion of fact of prior criminality required because prosecution's purpose could have been accomplished by evidence that did not intimate illegality); *United States v. Spletzer, supra* note 7, 535 F.2d at 956 (prejudicial elements of evidence not needed to fulfill the purpose asserted may not be admitted); *United States v. McFadyen-Snider*, 552 F.2d 1178, 1183 (6th Cir. 1977) (court must look to the "real reason" the prosecution wants the evidence of prior misconduct admitted).

**10.** *E. g., United States v. Haldeman, supra* note 5, 181 U.S.App.D.C. at 312, 559 F.2d at 89 (1976) (prior-crime evidence was admissible because desire to conceal identities of those involved in earlier wrongdoing was a possible motive for the crime being tried).

**11.** There appears to be no reason why the Government could not have its witness Plater testify that on December 14, 1976—49 hours before the shooting—he saw Day enter and drive away a 1974 Buick Electra 225 with a green body and tan roof and bearing a specific license plate number. Similarly, the Irving's witnesses could, for all we know, testify that on December 15—31 hours before the homicide—Day left the sporting goods store in possession of full-length shotguns bearing particular serial numbers. The Government has not yet given either the District Judge or this court any reason why the evidence just mentioned could not realistically be developed at trial without mention of the fact of prior criminality, and the burden is surely on the Government to support its request for a pretrial ruling on admissibility. Should it eventuate that the element of illegality cannot feasibly be excised from evidence establishing the occurrences probative on disputed material issues, and should the trial judge thereupon find that the balancing process favors admission, Day would then have to decide whether to stipulate to his possession of the automobile and the weapons at the critical times in order to avoid admission. See *United States v. Durcan*, 539 F.2d 29, 30 (9th Cir. 1976) (trial court should have compelled Government's acceptance of stipulation by individual accused of smuggling goods from Canada that he had acquired the articles in Canada; improper to allow Government to reject stipulation and instead introduce evidence that the items were stolen in Canada).

**12.** See notes 8–10 *supra* and accompanying text.

show how the jackets were originally acquired, or for that matter how Day first started to use narcotics. Should the prosecutor undertake to prove that the coats over which Day and the victim had quarreled all had been lawfully purchased at a department store, would anyone dispute a ruling that the line of questioning was irrelevant? Surely not. The end promotable by evidence of the origin of the guns, and the *only* end, is that knowledge of that illicit acquisition will poison the jury against Day. The District Judge quite properly noted that the dispute was not over the Irving's robbery or the theft of the automobile themselves, and I agree with him that the prosecutor did not demonstrate "that there is a relationship between the robbery in terms of what he is actually endeavoring to show, namely, that there was ill will, a dispute or controversy between the decedent and the Defendant Day." [13]

The court embraces the Government's argument on motive by reliance on the shibboleth that "[t]hieves will out." [14] Under this theory, no competent evidence need be proffered or introduced to show that Day and Williams had a falling out stemming from one of their earlier criminal enterprises. Rather, prior criminal activity is considered ipso facto probative of motive, and the rule that evidence of the accused's past crimes is inadmissible to prove a general criminal disposition is swallowed by the motive exception in cases where the victim of the crime and the defendant were former colleagues in criminal endeavors. [15]

The traditional rationale for the motive exception is that "[e]vidence of other crimes is admitted to show that defendant has a reason for having the requisite state of mind to do the act charged, and from this mental state it is inferred that he did commit the act." [16] The court adopts an inverted view, reasoning that "the motive may be inferred from the killing itself," "[g]iven the criminal relationship between the parties and their theft of the guns and the car." [17]

More troubling, no evidence of a disagreement between Day and Williams is required. The basis for the court's ruling is its theory of human behavior—thieves are prone to fighting and killing each other. Thus boiled down, the court's thesis seems indistinguishable from the not unnatural jury inference that Rule 404(b) is designed to guard against: that an accused with a criminal past is probably guilty. [18]

---

13. Transcript of Oct. 25, 1977, Hearing at 69–70; see *United States v. Kelley*, 545 F.2d 619, 623 (8th Cir. 1976), *cert. denied*, 430 U.S. 933, 97 S.Ct. 1555, 51 L.Ed.2d 777 (1977) (District Court's determination that other-crimes evidence was simply irrelevant to any material issue "will not be disturbed absent a clear showing of abuse of discretion").

14. Majority Opinion (Maj. Op.), 192 U.S.App. D.C. at ——, 591 F.2d at 876.

15. The court's reliance on *United States v. Bobbitt*, 146 U.S.App.D.C. 224, 228, 450 F.2d 685, 689 (1971), and *Wakaksan v. United States*, 367 F.2d 639, 645 (8th Cir. 1966), is misplaced. See Maj. Op., 192 U.S.App.D.C. at ——, 591 F.2d at 876. The bad-acts evidence held admissible in those cases concerned the accused's history of threatening or abusing the victim; the fact of a "prior criminal relationship" was not the linchpin. Indeed, *Bobbitt* provides an instructive contrast to the court's approach:

> The question before us is subject to the consideration giving the court greater discretion for admitting other crimes on the basis of materiality to the issue of motive. The prior relationship between the parties is obviously material in determining what motive the defendant might have had to shoot decedent. Here, where there was other evidence that there had been 'bad blood' between appellant and the deceased . . . the judge did not abuse his discretion in admitting evidence of a prior threat with shotgun.

146 U.S.App.D.C. at 228, 450 F.2d at 689. Similarly, other precedents sanctioning admission of evidence of the defendant's prior crimes to prove motive involved evidence indicating a rather specific reason for the defendant to commit the charged crime. *E. g., United States v. Dansker*, 537 F.2d 40, 57–58 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

16. 2 J. Weinstein & M. Berger, Evidence ¶ 404[09], at 404–53 (1977).

17. Maj. Op., 192 U.S.App.D.C. at ——, 591 F.2d at 876.

18. See text *infra* at notes 31–33.

The majority also says that the evidence was admissible to prove intent because it is probative of a plan to commit the crimes with which Day is charged. A criminal, it is said, would want to saw off stolen shotguns since they then could not be traced to him through records attending legitimate purchases.. Similarly, it is added, a person contemplating use of an automobile in a murder plot would want to use a stolen one to conceal his participation. I agree that the shotgun evidence might barely meet the minimal relevancy standards of Rule 401 for the purpose proposed by the court, but the District Judge would still have to determine whether its value was outweighed by its potential for prejudice.[19] And I am unable to accept at all the court's hypothesis with respect to the automobile theft, for I believe an inference of a murder scheme, in the absence of even a single piece of evidence thereof, is unwarranted. Any such deduction, though a possible analysis of human behavior, is not a substitute for probative evidence.

The court informs the District Judge that his inadmissibility-ruling on the ground of irrelevancy was "both premature and overbroad"[20] because the Government should have the opportunity to lay a proper foundation for the evidence. If the judge's action was premature, it was so simply because the *Government* requested a pretrial decision and did not fulfill *its burden* of advancing adequate ground for the ruling desired. If the Government could have come up with better reasons, if could always have gone back before the District Judge and sought modification of the earlier order. I think it a serious waste of judicial resources for us to be called upon to do what the prosecution should have requested in the District Court. Furthermore, the rationale now advanced by the majority was never driven home to the District Judge. In my view, he was correct on every point upon which he passed but nonetheless he now is somehow being reversed in part.

### B. *Identity*

The attempt to use the prior misconduct to show identity is somewhat more justifiable, but not by a wide margin. The Government represents that it does not have an eyewitness to the shooting or the altering of the shotguns who can identify Day in court.[21] It does have, however, what it considers to be the weapon used in the killing and the automobile in which the shooting occurred. That gun, as well as other sawed-off weapons and the discarded portions of their barrels, were all found at the house in which Day was arrested; the car was found parked nearby, and its keys were seized from the room in which Day was sleeping just before his capture. Also found in the bedroom were hacksaws and pants stained with blood of the victim's type. The same kind of blood was also found on the murder weapon and the car.

A jury could surely draw an inference of identity from these direct post-offense links tending to connect Day with the car and the shotguns, including the murder weapon.[22] Unsatisfied, however, the Government would undertake to demonstrate that Day had possession of all of these just a day or two prior to the murder. That would obviously be relevant evidence, and the District Judge did nothing to preclude proof of

---

**19.** See text *infra* at notes 25–29.

**20.** Maj. Op., 192 U.S.App.D.C. at ——, 591 F.2d at 877.

**21.** Brief for Appellant at 13–14. Mason did see the shooting and did identify Day as the assailant to the grand jury. He was, however, apparently unable to select Day from a lineup.

**22.** The Government does not agree that this circumstantial evidence is sufficient to overcome a motion for a judgment of acquittal, and concludes "that without the use of the 'other crimes' evidence the Government will be effectively disabled from providing answers to these questions [of identity and intent]." Brief for Appellant at 14. Even were this true, which of course, I do not consider, inadmissible evidence is not rendered admissible simply because the Government otherwise would have difficulty proving its case.

exactly those facts.[23] The problem is that the Government wishes to go further than showing mere possession; it wants to show how control was acquired—that is, through the commission of certain other crimes. But why is that pertinent? I say that it is not relevant,[24] and certainly not "highly probative,"[25] and that the "how" could serve only to tar the accused's character. The blood-stained pants, just as the gun and the car, link Day to the homicide, but the Government has manifested no disposition to show how Day originally came into possession of those pants—perhaps because the acquisition did not involve any known impropriety.

In sum, under the District Judge's pretrial rulings the prosecution can offer evidence tending to establish a number of facts growing out of the commission of other crimes: that Day and the victim had a dispute over the shotguns and that Day acquired the death weapon and the automo-

bile a few days before the shooting. More than that will unnecessarily and unfairly sully the accused with the aura of other criminality. Showing *how* the guns and the car were acquired—as opposed to the fact *that* they were possessed—would justifiably be ruled irrelevant had the acquisitions been perfectly innocent.[26] No different result should follow when that evidence is prejudical in nature.[27]

I am thus unable to perceive any justification at all for injecting the spectre of the automobile theft into this case. The Irving's robbery might make some small contribution toward one specific issue,[28] but even were it necessary to reach the step of balancing prejudice against this quantum of probative value, I could not concur in the court's unmistakable instruction that admission should probably be the result.[29] In the first place, balancing is traditionally left to the discretion of the trial court,[30] and dis-

---

**23.** Indeed, the Government could have argued that because Day's plea of guilty to the earlier crimes was an admission of the facts alleged in the counts charging those offenses, conceivably he is collaterally estopped from denying that he had possession of the automobile on December 14 or of the shotguns on December 15. This "difficult issue" is not presented to us, however. See *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1076 (2d Cir. 1977).

**24.** In *United States v. Durcan, supra* note 11, the Ninth Circuit dealt with a legally similar case in which the accused was charged with smuggling and with causing entry of goods into the United States by means of a false statement. The trial court allowed the prosecution to introduce evidence that the items in question had been stolen in Canada, although the accused offered to stipulate that he had "acquired" them in that country. On appeal the court reversed, 539 F.2d at 30, and in a later opinion explained its rationale in language directly showing its applicability to this case: "All the prosecution had to prove in *Durcan* was *where* the goods were acquired, no[t] *how*." *United States v. Kalama*, 549 F.2d 594, 596 (9th Cir. 1976), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1147, 51 L.Ed.2d 564 (1977).

**25.** Maj. Op., 192 U.S.App.D.C. at ——, 591 F.2d at 877. The court has developed a theory under which the evidence of the automobile theft would be relevant to proving that Day helped steal the shotguns, which itself would be probative of his possession of the

weapons. *Id.* 192 U.S.App.D.C. at ——, 591 F.2d at 874. Even if the fact that the shotguns possessed had been stolen was probative of anything, the Government had two eyewitnesses from the Irving's robbery who identified Day at the first trial, and thus there is no need in that regard for trying to tie Day to the Irving's robbery through the automobiles.

**26.** See Fed.R.Evid. 401–402; *United States v. Morgan*, 189 U.S.App.D.C. 155, 158, 581 F.2d 933, 936 (1977), ("[t]he district court has wide discretion to admit or exclude evidence where the question is one of relevancy or materiality").

**27.** Fed.R.Evid. 403 assumes that evidence analyzed under it has already been determined relevant.

**28.** See text *supra* at note 14.

**29.** See Maj. Op., 192 U.S.App.D.C. at ——, 591 F.2d at 877–879.

**30.** *United States v. Robinson*, 560 F.2d 507, 514–515 (2d Cir. en banc 1977); *United States v. Myers*, 550 F.2d 1036, 1045 (5th Cir. 1977); *United States v. Czarnecki*, 552 F.2d 698, 702 (6th Cir.), *cert. denied*, 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977); *United States v. Harris*, 542 F.2d 1283, 1317 (7th Cir. 1976), *cert. denied*, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); *United States v. Parker*, 549 F.2d 1217, 1222 (9th Cir.), *cert. denied*, 430

cretion fettered so narrowly as by the strong language of the majority opinion here is no discretion at all. Having balanced, the court remands for balancing.

Nor do I agree with the directions given. Whatever limited relevance one sees in the evidence of Day's other sins pales in comparison to its potential for prejudice. Though the court seemingly has a difficult time in perceiving what that prejudice might be,[31] I have no problem at all. The possibility of prejudice inheres in all other-crimes evidence: "Evidence of a prior crime 'is *always* . . . prejudicial to a defendant [because it] diverts the attention of the jury from the question of the defendant's responsibility for the crime charged to the improper issue of his bad character.' "[32] Though the other crimes here do not overshadow the grave offenses for which Day will actually stand trial, it takes no great familiarity with human nature to know that jurors might well reason that a person who commits armed robbery and steals weapons and an automobile is capable of homicide,

and that if a murder occurs and is linked to him in any way he probably is responsible.

Similarly, I am unable to see the importance of the fact that Day knows the nature of the evidence and cannot contend that it is unreliable because he pleaded guilty to the other crimes.[33] The immateriality of those considerations becomes obvious when one recalls the purpose of the other-crimes rule. We are not concerned with whether the accused actually engaged in prior wrongdoing but with whether he is innocent or guilty of the offense with which he is currently charged. No matter how certain we are that the accused committed crime X, we are not permitted to conclude from that knowledge that he committed crime Y.

## II. THE MASON HEARSAY TESTIMONY

I am in complete accord with the court's application of Judge MacKinnon's perceptive opinion in *Brown*[34] to the bulk of the statements made by Williams to Mason.[35] I

U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977); *United States v. Nolan*, 551 F.2d 266, 271 (10th Cir.), *cert. denied*, 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977). In a pretrial appeal such as this, a District Judge's generally superior ability "to evaluate the impact of the evidence, since he sees the witnesses, defendant, jurors, and counsel, and their mannerisms and reactions," *United States v. Robinson, supra*, 560 F.2d at 514, may not be implicated because the record before him is as cold as when it reaches us. Nonetheless, the District Judge was still more familiar with the entire context of the case than we are likely to be. In any event, because our criminal justice system is based on the philosophy that malfunctions ordinarily should harm the interests of the state and not the individual, see Underwood, *The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases*, 86 Yale L.J. 1299, 1306 (1977); *cf. Speiser v. Randall*, 357 U.S. 513, 525–526, 78 S.Ct. 1332, 1341–1342, 2 L.Ed.2d 1460, 1472–1473 (1958), the judge's discretion in admitting other crimes evidence may well be narrower than in excluding it.

31. See Maj. Op., 192 U.S.App.D.C. at ——, 591 F.2d at 877–878.

32. *United States v. James, supra* note 4, 181 U.S.App.D.C. at 63, 555 F.2d at 1000, quoting *United States v. Phillips*, 401 F.2d 301, 305 (7th Cir. 1968) (emphasis supplied).

33. Maj. Op., 192 U.S.App.D.C. at ——, 591 F.2d at 877–878.

34. *United States v. Brown*, 160 U.S.App.D.C. 190, 490 F.2d 758 (1973).

35. The Government relies primarily on *United States v. Pheaster*, 544 F.2d 353 (9th Cir. 1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977), in which the Ninth Circuit approved the admission of testimony—hearsay testimony—that a kidnap victim had said just before his disappearance that he was going to meet one of the defendants at a certain spot. The question whether a declarant's statement of his own intentions can be used to establish inferentially another's intentions is not the issue involved in this case, and even by analogy *Pheaster* is no help to the Government. The trial in *Pheaster* occurred prior to the effective date of the Federal Rules of Evidence, and the court indicated that under those rules state-of-mind hearsay evidence may not be used to establish the happening of past events. *Id.* at 380; see H.R.Rep.No.650, 93d Cong., 1st Sess. 13–15, U.S.Code Cong. & Admin.News 1974, p. 7051; Advisory Committee's Note to Fed.R. Evid. 803(3). The court also noted that the decision it reached was not compatible with the opinion in *Brown*. See 544 F.2d at 380 n.18.

cannot, however, reconcile *Brown* with admission of (a) the slip bearing appellees' names and a telephone number, (b) testimony by Mason that when Williams turned the slip over he made a statement or (c) evidence that Mason called the police after the shooting and gave them the information on the slip—when it is combined with the first two.[36]

To begin with, if testimony averring the mere delivery of the slip is as "neutral" as the court labels it,[37] then by the same token it is also quite irrelevant. And if the writing on the slip does "not assert anything except that Beanny and/or Eric might have a particular telephone number" and "is not being offered as proof that Beanny and/or Eric had that telephone number,"[38] what possible justification is there for allowing its admission? If as the court holds,[39] Mason cannot reveal to the jury the content of Williams' statement accompanying the delivery, what is accomplished by showing simply that a statement was made? And if Mason's post-homicide call to the police conveyed nothing but valueless data on the slip, what importance would it have to the issues? Regardless of hearsay analysis, here, as with the proffered but so far rejected testimony that Williams said his leg was hurting, the "evidence is admissible only if it is relevant and fairly probative on a material issue in the case."[40]

The court suggests that this evidence "tends to show a current *association* between Williams and individuals named 'Beanny' and 'Eric'."[41] This theory was never mentioned by the Government in any of its lengthy pretrial filings, probably because it has a long line of witnesses, including Mason himself, who could testify *directly* to the undisputed fact that Williams knew Day and Sheffey and had been in contact with them shortly before the murder. The simple fact is that "in actuality, the Government seeks to have something more inferred"[42]: that Williams feared Day and Sheffey.

Thus, I cannot subscribe to my colleagues' theory that these items of evidence are innocuous. On the contrary, I have no difficulty in recognizing the implications they are apt to have for lay jurors. The only consequence thus far emerging[43] toward which these evidentiary items could contribute is that the jury will infer that Williams told Mason something about Day and Sheffey that would indicate that they were the parties who shot Williams an hour later. Thus, not from the *content* of Williams' statement to Mason but simply from its *making*, and from the turnover of a slip of paper naming both Day and Sheffey coupled with transmittal of that information to

---

**36.** See Maj. Op., 192 U.S.App.D.C. at ———, 591 F.2d at 883–886.

**37.** *Id.* 192 U.S.App.D.C. at ———, 591 F.2d at 885. It seems clear from the court's opinion that it would be highly improper for the Government to attempt to argue to the jury that it should draw any prohibited inference from this "neutral" evidence.

**38.** *Id.* 192 U.S.App.D.C. at ———, 591 F.2d at 883.

**39.** *Id.* 192 U.S.App.D.C. at ——— ——, 591 F.2d at 881–883.

**40.** *Id.* 192 U.S.App.D.C. at ———, 591 F.2d at 887.

**41.** *Id.* 192 U.S.App.D.C. at ———, 591 F.2d at 883 (emphasis in original).

**42.** *Id.* 192 U.S.App.D.C. at ———, 591 F.2d at 881. The court suggests that the Government's access to direct evidence of the fact that

Williams associated with Day and Sheffey "does not provide a reason to exclude the testimony [the slip and testimony concerning its delivery and Mason's call to the police] that we hold to be properly admissible." *Id.* 192 U.S.App.D.C. at ———, 591 F.2d at 886. As one distinguished work on this subject has put it, however, "where the danger of the jury's misuse of the evidence for the incompetent purpose is great, and its value for the legitimate purpose is slight *or the point for which it is competent can readily be proved by other evidence,* the judge's power to exclude the evidence altogether [should] be recognized." McCormick, Evidence 136 (2d ed. 1972) (emphasis supplied).

**43.** Like the court, *id.* 192 U.S.App.D.C. at ———, 591 F.2d at 883. I have no occasion to comment upon the proper course should Day or Sheffey eventually raise issues of self-defense or mistake.

the police, "[t]he jury is being asked to infer . . . that Day," and Sheffey as well, "bore ill will toward Williams and had reason to cause him harm."[44]

That the inference arising from Williams' delivery of the note is somewhat less obvious than that which would spring from the excluded content of his concomitant statement—his instruction to Mason to communicate with the police if he had not returned to his home by the following afternoon—does not mean that it is appreciably less potent. The urgent and threatening circumstances surrounding the episode are enough to demonstrate that Williams intended the utterance of the statement, as well as its content, as an assertion that he feared Day and Sheffey,[45] and thus it can be no more reliable than the words themselves. Consequently, even assuming that Mason's description of the physical events would not be hearsay when viewed completely in isolation, it does not follow that

the inferences the jury may well draw,[46] and that the Government patently wants drawn,[47] from Williams' behavior are unburdened by the dangers of hearsay.[48]

I submit that, in the milieu in which it was made, the fact of Williams' statement does not qualify under the hearsay-rule exception for nonassertive nonverbal conduct. I say, too, that the text of Williams' note—plainly intended as a message from Williams to the police, through the medium of transmittal by Mason—deserves the usual fate of unmitigated hearsay. I think, in sum, that each of the evidentiary items under discussion is inadmissible even if accompanied by a limiting instruction.[49] Since Williams cannot be confronted nor his perception, memory, narrative-accuracy and sincerity tested,[50] I would exclude not only the statement but also all its behavioral trappings. Because the court refuses to uphold the District Judge on this score and on his rejection of the other-crimes evidence

44. *Id.* 192 U.S.App.D.C. at ——– ——, 591 F.2d at 881–882.

45. See Fed.R.Evid. 801(a) and the Advisory Committee's Note thereto; 4 J. Weinstein & M. Berger, Evidence ¶ 803(3)[5], at 803–118 (1977).

46. In *Brown, supra* note 34, there was only one level of inference to deal with because the victim had expressly stated that he was afraid of the accused. We were concerned, however, that the jury might infer that Brown "had done things in the past to [the victim] to justify this fear, or that Brown had explicitly threatened [the victim's] life in the past." 160 U.S.App. D.C. at 200, 490 F.2d at 778. Here we have two levels of inference. From Williams' strange conduct the jury may conclude that he dreaded Day, and then it may draw the *Brown* inference that Day had done something to warrant Williams' apprehension. The first inference is so strongly compelled by the evidence the court rules admissible that this situation cannot possibly be distinguished from that in *Brown* on the basis of the purposes of the hearsay rule.

47. See 4 J. Weinstein & M. Berger, Evidence ¶ 801(a)[01], at 801–50 (1977), citing *United States v. Barash*, 365 F.2d 395 (2d Cir. 1966), *after remand*, 412 F.2d 26 (2d Cir.), *cert. denied*, 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969) (opponent of introduction need not establish that conduct was intended as assertion if proponent is using it for that purpose or if the conduct on its face is equivalent to a statement).

48. See Maj. Op. at note 46, quoting 4 J. Weinstein & M. Berger, Evidence ¶ 801(c)[01], at 801–63 (1977) (inquiry should focus "'on the hearsay dangers posed'"); McCormick, Evidence § 250, at 599 (2d ed. 1972). Conduct may often be less dangerous than statements because it frequently entails the declarant's reliance upon the veracity of the assertion implied, and thus removes the declarant's possible lack of sincerity. No such reliance is to be found where, as here, the conduct is consciously assertive in nature. Williams' actions here, even if not consciously intended as an assertion themselves, were merely necessary accompaniment to the oral statement excluded by the court, and thus cannot possibly be any more reliable.

49. See *United States v. Brown, supra* note 34, 160 U.S.App.D.C. at 206, 490 F.2d at 774.

50. See *Moore v. United States*, 429 U.S. 20, 22, 97 S.Ct. 29, 30, 50 L.Ed.2d 25, 28 (1976). "No liberalization of evidentiary rules can circumscribe the fundamental right to confrontation and cross-examination." *United States v. Rogers*, 549 F.2d 490, 499 n.11 (8th Cir. 1976), *cert. denied*, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977). Because I believe admission of this evidence is improper under the Federal Rules of Evidence, I have no need to reach the constitutional issue.

implicating Day, I must respectfully dissent.